# SUMMONS
## *(CITACION JUDICIAL)*


*7645016*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
COUNTRYWIDE HOME LOANS, INC. f/k/a AMERICAS
WHOLESALE LENDER, COUNTRYWIDE HOME LOANS, INC., and
COUNTRYWIDE BANK, FSB; and DOES 1 through 200, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
DOROTHY PERALTA, STEVEN S. BIGVERDI and JAMES
MOSCOSO, on behalf of themselves and others similarly situated

**FILED**
**ALAMEDA COUNTY**

**JUN 0 2 2009**

CLERK OF THE SUPERIOR COURT
By _Sacha Perry_

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*

ALAMEDA COUNTY SUPERIOR COURT
1225 FALLON STREET
OAKLAND CA 94612-4280

CASE NUMBER
*(Número del Caso):* RG 09455493

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gerson H. Smoger, Esq., SMOGER & ASSOCIATES
3175 Monterey Blvd., Ste. 3, Oakland, CA 94602   (510) 531-4529

DATE: JUN 0 2 2009   Pat S. Sweeten   Clerk, by _Sacha Perry_, Deputy
*(Fecha)*   *(Secretario)*   *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc. | www.USCourtForms.com



*7645020*

1 **SMOGER & ASSOCIATES**
Gerson H. Smoger (SBN 79196)
2 gersonsmoger@gmail.com
Steven M. Bronson (SBN 246751)
3 steven.bronson@gmail.com
Mark T. Baller (SBN 261331)
4 markballer@gmail.com
3175 Monterey Blvd
5 Oakland, CA, 94602-3560
Phone: (510) 531-4529
6 Fax:     (510) 531-4377

7 **SEEGER WEISS LLP**
Jonathan Shub (SBN 237708)
8 jshub@seegerweiss.com
Miriam L. Schimmel (SBN 185089)
9 mschimmel@seegerweiss.com
1515 Market Street, Suite 1380
10 Philadelphia, PA 19107
Phone: (215) 564-2300
11 Fax     (215) 851-8029

12 Attorneys for Plaintiffs and all others similarly situated.

**F I L E D**
**ALAMEDA COUNTY**

JUN 0 3 2009

CLERK OF THE SUPERIOR COURT
By _____
Deputy

**ARBOGAST & BERNS LLP**
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns, Esq. (SBN 131351)
jberns@law111.com
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000
Fax:     (818) 654-5988

13

14               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                          **COUNTY OF ALAMEDA**

16
DOROTHY PERALTA, STEVEN S.          )   CASE NO.  RG  09455493
17 BIGVERDI and JAMES MOSCOSO, on behalf )
of themselves and others similarly situated, )
18                                     )   **CLASS ACTION COMPLAINT FOR:**
                                      )
19             Plaintiffs,            )   (1)   **Fraudulent Omissions;**
                                      )
20                                    )   (2)   **Violation of Bus. & Prof. Code §17200,** *et*
        v.                            )         *seq.* **– "Unlawful," "Unfair" and**
21                                    )         **"Fraudulent" Business Practices;**
                                      )
22 COUNTRYWIDE HOME LOANS, INC. f/k/a  )   (3)   **Breach of Contract; and**
AMERICAS WHOLESALE LENDER,          )
23 COUNTRYWIDE HOME LOANS, INC., and  )   (4)   **Tortious Breach of the Covenant of Good**
COUNTRYWIDE BANK, FSB; and DOES 1   )         **Faith and Fair Dealing.**
24 through 200, inclusive,            )
                                      )
25                                    )
            Defendants.               )   **JURY TRIAL DEMANDED**
26                                    )
                                      )
27 ──────────────────────────────── )

28

─────────────────────────────────────────────────
                    CLASS ACTION COMPLAINT

Plaintiffs, DOROTHY PERALTA, STEVEN S. BIGVERDI and JAMES MOSCOSO, individually, and on behalf of all others similarly situated, allege as follows:

I.

## INTRODUCTION

1.      This is an action pursuant to California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code §§ 17200, *et seq.,* and other California statutory and common law.  Plaintiffs STEVEN S. BIGVERDI, and DOROTHY PERALTA, and JAMES MOSCOSO ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against COUNTRYWIDE HOME LOANS, INC. f/k/a AMERICA'S WHOLESALE LENDER, COUNTRYWIDE HOME LOANS, INC., and COUNTRYWIDE BANK, FSB; and DOES 1 through 200 ("COUNTRYWIDE" or "Defendants"), based upon Defendants' non-disclosure and fraudulent concealment of material information relating to Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents, and in the accompanying required disclosure statements, including: (i) the actual interest rate on the note(s); (ii) that the initial interest rate disclosed in the Note would last only one month, was discounted, and was substantially lower than the actual interest that Plaintiffs and Class members would be charged on the Notes; (iii) that the amount of monthly payments provided for in the Note and for the first 2-5 years in the Truth in Lending Disclosure Statement ("TILDS") was based entirely on the "teaser" rate; and (iv) that, after one month the scheduled monthly payment would not be sufficient to even pay the interest being charged, let alone amortize the loan, so that each month the principal balance would increase even if the payments were made as scheduled.  (Hereinafter, (i) through (iv) shall be referred to as "The Material Omissions").


II.

## THE PARTIES

2.      Plaintiff, DOROTHY PERALTA is, and at all times relevant to this Complaint was, an individual residing in Torrance, California.  On or about August 19, 2005, Plaintiff entered into an Option ARM loan agreement with COUNTRYWIDE.  The Option ARM loan was secured by Plaintiff's residence.  Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Note, Truth and Lending

1

CLASS ACTION COMPLAINT

Disclosure Statement ("TILDS") and Program Disclosure (collectively the "Loan Documents"),
pertinent to this action.

3.     Plaintiff, STEVEN S. BIGVERDI is, and at all times relevant to this Complaint was, an
individual residing in Los Angeles County, California.  On or about April 7, 2005, Plaintiff refinanced
his existing home loan and entered into an Option ARM home loan agreement with COUNTRYWIDE
which was secured by Mr. Bigverdi's residence.  Attached hereto as Exhibit 2 is a true and correct copy
of the Loan Documents.

4.     Plaintiff, JAMES MOSCOSO is, and at all times relevant to this Complaint was, an
individual residing in Hayward, California.  On or about September 12, 2005, Plaintiff entered into an
Option ARM loan agreement with COUNTRYWIDE.  The Option ARM loan was secured by Plaintiff's
residence.  Attached hereto as Exhibit 3 is a true and correct copy of the Loan Documents, Note, TILDS
and Program Disclosure pertinent to this action.

5.     Plaintiffs are informed, believe, and thereon allege, that Defendants COUNTRYWIDE
HOME LOANS, INC. f/k/a AMERICA'S WHOLESALE LENDER, COUNTRYWIDE HOME
LOANS, INC., and COUNTRYWIDE BANK, FSB (collectively "COUNTRYWIDE") are, and at all
material times relevant to this Complaint were, qualified to do business in California.  Defendant
COUNTRYWIDE HOME LOANS, INC. ("CHL") is a California corporation headquartered in
Calabasas, California.  CHL is, and at all relevant times was, the focal point of COUNTRYWIDE's
home mortgage activities and directed and controlled those activities, including by controlling the
contents of the loan documents at issue here, from its Calabasas headquarters.  At all relevant times
hereto, Defendants were and are engaged in the business of originating and selling the Option ARM
loans that are the subject of this Complaint.  Defendants transact business in Alameda County,
California and at all relevant times sold Option ARM loans throughout the United States, including
Alameda County, California.  Defendants have significant contacts with Alameda County, California,
and the activities complained of herein occurred, in whole or in part, in Alameda County, California.

6.     From its headquarters and principal place of business in Calabasas, California,
COUNTRYWIDE created, approved, disseminated, and sold the Option ARM loans that are the subject
of this complaint.  COUNTRYWIDE sold a significant number of the subject Option ARM loans to

2

California residents. Plaintiffs are informed and believe and thereon allege that Defendants' employees and/or agents responsible for the creation, approval and sale of the subject Option ARM loans are located in California, and/or the decisions concerning approval of the loan forms and/or approval of the Plaintiffs and the Class members loans where authorized and/or approved by Defendants' corporate officers, executives and employees located in California.

7.     Plaintiff is further informed, believes, and thereon alleges that:

    (a)     CHL is, and or was, in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles so that it could sell bonds to investors based on the income to be derived from those loans. CHL is a critical and necessary participant in that securitization process;

    (b)     CHL agreed to purchase and did purchase numerous Option ARM mortgages originated by the other Defendants. Through that arrangement, the other Defendants collected fees from the homeowners to whom it sold the Option ARM loans as well as from CHL, while CHL collected revenues through the securitization process; and

    (c)     CHL's agreement to purchase the Option ARM loans sold by the other Defendants was critical to the other Defendants' ability to sell those loans to Plaintiffs and other homeowners, since the other Defendants lacked the financial resources to continue to issue the Option ARM loans here at issue unless it was able to sell them to investors such as CHL.

8.     At all times mentioned herein, Defendants were engaged in the business of originating, selling, servicing, and/or owning, and/or are or were the assignees of the Option ARM loans that are the subject of this Complaint, throughout the State of California, including in Alameda County, California.

9.     Plaintiffs are informed, believe, and thereon allege, that each of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendant.

CLASS ACTION COMPLAINT

10.     Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and was at all times acting within the purpose and scope of such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

11.     Plaintiffs are informed, believe, and thereon allege, that at all times herein mentioned, each Defendant was acting in concert or participation with each other, or were joint participants and collaborators in the acts complained of, and was the agent or employee of the others in doing the acts complained of herein, each and all of them acting within the course and scope of said agency and/or employment by the others, each and all of them acting in concert one with the other and all together. Each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

12.     Plaintiffs are informed, believe, and thereon allege, that DOES 1 through 200, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when they are discovered.

13.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 200, inclusive, and each of them, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and belief, that each Doe defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of Court to amend this Complaint when the names of said DOE defendants have been ascertained.

/ / /

/ / /

/ / /

## III.

### JURISDICTION AND VENUE

14.     This Court has jurisdiction over this matter pursuant to the California Constitution, Article XI, Section 10 and California Code of Civil Procedure ("CCP") §41 0.1 0 because Defendants transacted business and committed the acts complained of herein in California.  The allegations are sufficient to sustain the causes of action without resort to federal law.  More than two-thirds of the Class Members are from California, own property in California which is or was financed and/or secured by the Option ARM loans at issue, all Defendants are located in California, and COUNTRYWIDE has its principal place of business in and is headquartered in California; thus, this case is not subject to removal under the Class Action Fairness Act of 2005 under both the "home state exception" and the "local controversy exception." 28 U.S.C. §1332(d)(4)(A) (home state exception); 28 U.S.C. §1332 (d)(4)(B) (local controversy exception).

15.     Venue is proper in Alameda County, California pursuant to CCP §395 and because many of the acts complained about occurred in Alameda County and Plaintiffs and Class Members reside in Alameda County.

## IV.

### FACTS COMMON TO ALL CAUSES OF ACTION

16.     The Option ARM loans that are the subject of this Complaint are the loans sold by Defendants with the following common characteristics: (i) the Monthly Payment Amount stated in the Note is based upon a low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule listed in the Truth-In-Lending Disclosure Statements ("TILDS"), for the first 2-5 years of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) in fact, the interest rate "adjusts" after only one month to a much higher rate that is the sum of the "index" and the "margin"; and (iv) after the first 2-5 years, the amount of monthly payments balloons to a much greater amount.

17.     At all times material hereto, the index plus margin was never low enough to be close to the "teaser" rate, so that, after only one month, the interest accruing on the Note more than doubled from an amount that was usually below 2% to an amount of at least 4%, and normally closer to 8%.

Indeed, the average interest rate on these loans was approximately 7.87%, fully 2 percentage points higher than the prevailing rate on COUNTRYWIDE's fixed rate loans. Because of this dramatic interest rate adjustment after only one month, the monthly payment, which was calculated based on a fully amortizing payment at the low teaser rate, was no longer sufficient to even pay the interest that accrued on the Note, and the balance owed increases even if the payments are made as scheduled on the Note and the TILDS. This process is known as negative amortization, and Defendants knew it was certain to occur because of the large spread between the teaser rate and the combined index and margin.

18.   Because of the way COUNTRYWIDE structured these Option ARM loans, it was certain that, as payments were made each month for the first 2-5 years of the loan, each Class Member would owe more money than he or she did at the start of the loan, and have less time to pay it back. To make matters worse, this "deferred interest" was added to the principal balance and, in turn, accrued more interest – in effect using compound interest to increase the balance owed by each borrower.

19.   These undisclosed facts were known to COUNTRYWIDE. In its 10K for the year ending December 31, 2006, COUNTRYWIDE clearly and concisely reported to its investors that the loans at issue here would cause negative amortization and that the existence of that negative amortization feature would ultimately create problems for borrowers. COUNTRYWIDE reported: "These loans are different than 'traditional' loans in that they may allow paying less than full interest payments (thereby increasing the loan balance) in the early periods of a loan's life." It also reported its methods for protecting its own bottom line from the increased risk of borrower default that negative amortization created, including insuring that the loans it issued could be sold into the secondary market and off its own balance sheets as quickly as possible. Indeed, COUNTRYWIDE sold nearly all of the mortgage loans that it produced in the secondary market, primarily in the form of mortgage backed securities.

20.   The fact that negative amortization is certain to occur on the subject loans was information that Plaintiffs and Class Members would have found material when deciding whether to purchase the subject COUNTRYWIDE Option ARM loan. Despite this, COUNTRYWIDE never disclosed to Plaintiffs and Class Members this material information. Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the loan products.

/ / /

1      21.    As reasonable consumers, Plaintiffs and Class members would find information

2   regarding the interest rate on the loan and the amount of the monthly payments material, including,

3   without limitation, the fact that negative amortization was certain to occur if the monthly payment

4   schedule, given to Plaintiffs and the Class Members prior to entering into the loans, was followed.  The

5   subject COUNTRYWIDE Loan Documents failed to disclose this material information to borrowers

6   before they entered into the loans.  Moreover, the Loan Documents presented to borrowers at the time of

7   closing, contained partially true statements but failed to provide all of the true facts, and thus, the

8   COUNTRYWIDE Loan Documents were false and/or misleading.  For instance, Defendants disclosed a

9   teaser interest rate, but they did not disclose that this rate would sharply increase after only one month.

10   Defendants disclosed a low monthly payment for the first 2-5 years of the loan, which was based on the

11   teaser rate, but this did not reflect the actual amount of interest being charged or the amount Plaintiffs

12   and Class Members actually owed each month to prevent negative amortization.

13      22.    Before they entered into the subject COUNTRYWIDE Option ARM Loan, Plaintiffs and

14   Class Members were not informed of the sharp increase in the interest rate, and the fact that their

15   monthly payments were not enough to pay the interest accruing on the loan, until they had made at least

16   several payments following the closing of the loan, at which time they would receive a statement

17   showing that the principal balance had increased since Defendants had increased the interest rate from

18   the teaser rate, despite the fact that the borrower had made all payments as scheduled.

19      23.    By the time Plaintiffs and Class Members realized that the Option ARM loans at issue

20   were certain to cause negative amortization to occur for the first 2-5 years of the loan, they were

21   "locked" into the loan by a draconian prepayment penalty consisting of a prepayment charge equal to

22   the interest that would accrue during a six-month period of the amount prepaid (if the prepayment

23   amount was greater than 20% of the original principal amount stated in the Note), which was calculated

24   at the rate of interest in effect under the terms of the Note at the time of the prepayment for a

25   prepayment occurring during the first two to three years of the loan.  *See* "Prepayment Penalty

26   Addendum", Exhibits 1-3, attached hereto.  This draconian provision was designed by

27   COUNTRYWIDE to deter anyone from refinancing the loan during the applicable time period.

28   / / /

24.   Before Plaintiffs and Class Members entered into the subject COUNTRYWIDE Option ARM loan, Defendants failed to disclose and concealed the amount by which their loan balances would increase over the first two to three years of the loan, even though Defendants had actually performed this calculation internally. This increase in the loan balance was material information to any consumer entering into these loans, because it effectively strips them of the equity in their homes, while also greatly impairing their ability to refinance these loans once they recast to substantially higher monthly payments.

25.   The loans were structured so that once Plaintiffs and Class Members were able to discover that their loans were negatively amortizing, they could get out of the loans only by incurring a substantial prepayment penalty, or waiting two to three years, in which case they would have to refinance a substantially larger principal amount.

26.   Each subject Option ARM loan has so-called payment caps, which provide that, even after the monthly payment increases, it will not increase by more than 7.5% per year. *See* Exhibits 1-3, ¶ 3(D). These payment caps are, however, subject to an overall cap on principal of 115% of the original loan amount. *See* Exhibits 1-3, ¶ 3(F). Once the loan principal reaches this 115% cap, the 7.5% limitation on payment increases no longer applies, and the payment generally will increase by far more than this amount. The existence of this built-in "payment shock" was material information that Plaintiffs and Class Members would have found to be material in deciding whether to purchase the loans, and how much to finance, as this "payment shock" is more than many Class Members could afford to pay.

27.   However, the most that Defendants' loan documents said about negative amortization was that it "may" occur. This was misleading and deceptive, because it implies that negative amortization was subject to some future contingency, such as an increase in the index on which the adjustable rate was purportedly based, when, in fact, it was *guaranteed* to occur after only one month, even if the index stayed the same or went down.

28.   The failure of Defendants to disclose this material information in the loan documents violated California consumer protection statutes, and common law, as more fully set forth below.

29.   Defendants' sharp increase in the interest rate after only one month, which guaranteed

---

8

CLASS ACTION COMPLAINT

1   negative amortization, also violated the terms of Defendants' own contract with Plaintiffs and Class

2   Members, and also breached the covenant of good faith and fair dealing.

3        30.    The loan characteristics described above were true of the named Plaintiffs' loans. These

4   were also the common characteristics of the standardized Loan Documents used by Defendants during

5   the liability period. It is these Loan Documents that are the subject of this Complaint.

6

7   <div align="center">**V.**</div>

8   <div align="center">**CLASS ACTION ALLEGATIONS**</div>

9        31.    Plaintiffs bring this action on behalf of themselves, on behalf of all others similarly

10  situated, and on behalf of the General Public. The Class Plaintiffs seek to represent is defined as

11  follows:

12          All California residents who, from May 27, 2003 through the date that

13          notice is mailed to the Class members, entered into a COUNTRYWIDE

14          Option ARM loan on their home located in the State of California.

15          Excluded from the California Class are Defendant's employees, officers,

16          directors, agents, representatives, and their family members, as well as the

17          Court and its officers, employees, and relatives.

18       Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court

19  at the appropriate time, or to propose or eliminate sub-Classes in response to facts learned through

20  discovery or legal arguments advanced by Defendants or otherwise.

21       32.    This action has been brought and may be properly maintained as a class action pursuant

22  to the provisions of California Code of Civil Procedure § 382 and other applicable law.

23       33.    **Numerosity**: - Code of Civ. Proc. § 382: Members of the Class are so numerous that

24  their individual joinder is impracticable. While the exact number of class members is unknown at this

25  time, Plaintiffs are informed and believe that the entire Class consist of approximately tens of thousands

26  of individuals residing in California. Also, while the precise number of Class members and their

27  addresses are unknown to Plaintiffs, however Plaintiffs are informed and believe that the number can be

28  obtained from the Defendants' records. Class members may be notified of the pendency of this action

<div align="center">9

CLASS ACTION COMPLAINT</div>

by electronic mail, the Internet, other mail, or published notice.

34.   **Commonality**: - Code of Civ. Proc. § 382: Common questions of law or fact are shared by class members. This action is suitable for class treatment, because these common questions of fact and law predominate over any individual issues. Such common questions include, but are not limited to, the following questions including questions related to the subject COUNTYWIDE Option ARM loans:

(a)   Whether Defendants engaged in unlawful, unfair and/or fraudulent business acts or practices likely to deceive Plaintiffs and Class Members before and during the loan application process;

(b)   Whether Defendants concealed, omitted and/or otherwise failed to disclose information they were mandated to disclose under state consumer protection statutes, and/or California common law;

(c)   Whether Defendants failed to disclose to Plaintiffs and Class Members, before they entered into the subject Option ARM loans, that negative amortization was certain to occur;

(d)   Whether Defendants had a duty to disclose the undisclosed material facts regarding the subject Option ARM loans

(e)   Whether Defendants' failure to apply Plaintiffs' and Class Members' payments to principal as promised in the form Notes constitutes a breach of contract, including a tortious breach of the covenant of good faith and fair dealing;

(f)   Whether Defendants' conduct in immediately raising the interest rate on the loans so that no payments were made to the principal balance breached the loan contract and/or constitutes a contractual or tortious breach of the covenant of good faith and fair dealing;

(g)   Whether the terms and conditions of the Loan Documents are unconscionable;

(h)   Whether the Loan Documents are non-negotiable instruments;

(i)   Whether Plaintiffs and Class Members are entitled to damages;

(j)   Whether Plaintiffs and Class Members are entitled to punitive damages; and

(k)   Whether Defendants' affirmative defenses, if any, raise common issues of fact or

10

CLASS ACTION COMPLAINT

1           law as to Plaintiff and Class Members as a whole.

2       35.   **Typicality**: Plaintiffs' claims are typical of the claims of absent Class Members.

3 Plaintiffs and the other Class members were subjected to the same kind of unlawful conduct and the

4 claims of Plaintiffs and the other Class Members are based on the same legal theories.

5       36.   **Adequacy**: Plaintiffs are adequate representatives of the Class because their interests do

6 not conflict with those of the other members of the Class Plaintiffs seek to represent. Plaintiffs have

7 retained counsel competent and experienced in complex class action litigation and Plaintiffs intend on

8 prosecuting this action vigorously. The interests of members of the Class will be fairly and adequately

9 protected by Plaintiffs and their counsel.

10      37.   **Ascertainable Class**: The proposed classes are ascertainable in that the members can be

11 identified and located using information contained in Defendants' mortgage lending records.

12      38.   **Superiority and Substantial Benefit**: A class action is superior to other available

13 means for the fair and efficient adjudication of Plaintiffs' and the Class members' claims. The damages

14 suffered by each individual Class member may be limited. Damages of such magnitude are small given

15 the burden and expense of individual prosecution of the complex and extensive litigation necessitated by

16 Defendants' conduct. Further, it would be virtually impossible for the Class members to redress the

17 wrongs done to them on an individual basis. Even if members of the Class themselves could afford such

18 individual litigation, the court system could not. Individualized litigation increases the delay and

19 expense to all parties and the court system, due to the complex legal and factual issues of the case. By

20 contrast, the class action device presents far fewer management difficulties, and provides the benefits of

21 single adjudication, economy of scale, and comprehensive supervision by a single court.

22      39.   In the alternative, the Class should be certified because:

23         (a)   The prosecution of separate actions by individual members of the Class would

24 create a risk of inconsistent or varying adjudications with respect to individual Class members which

25 would establish incompatible standards of conduct for Defendants;

26         (b)   The prosecution of separate actions by individual members of the Class would

27 create a risk of adjudications with respect to them, which would, as a practical matter, be dispositive of

28 the interests of the other Class members not parties to the adjudications, or substantially impair or

1  impede their ability to protect their interests; and

2          (c)    Defendants have acted or refused to act on grounds generally applicable to the

3  Class, and/or the General Public, thereby making appropriate final and injunctive relief with respect to

4  the Class as a whole.

5

6  **VI.**

7  **FIRST CAUSE OF ACTION**

8  **Fraudulent Omissions**

9  **(Against All Defendants)**

10      40.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

11      41.    Under California common law, COUNTRYWIDE had a duty to disclose to Plaintiffs, and

12  each Class Member that: (i) the promised low teaser interest rate was only available for thirty days if at

13  all; (ii) the payment amount for the first two to five years provided to Plaintiffs and Class Members on

14  the TILDS was insufficient to pay both principal and interest; (iii) negative amortization was absolutely

15  certain to occur if Plaintiffs and Class Members made payments according to the payment schedule

16  provided by Defendants; and that (iv) loss of equity and/or loss of Plaintiffs' and Class Members'

17  residence was certain to occur if Plaintiffs and Class Members made payments according to the payment

18  schedule provided by Defendants.  These facts constitute material information that Plaintiffs and Class

19  Members would have found material when deciding whether to purchase the loan product.  Had

20  Defendants disclosed this information, Plaintiff and Class Members would not have entered into the

21  subject COUNTRYWIDE Option ARM Loan on these terms.

22      At all relevant times, Defendants actively concealed these material facts from Plaintiffs and

23  Class Members.  At all relevant times, Defendants had superior, if not exclusive, knowledge of the

24  concealed facts.  Where Defendants did make disclosures, they made partial representations while

25  suppressing materials facts, as demonstrated herein.

26      42.    In each of the Loan Documents at issue, Defendants actively concealed and failed to

27  disclose to the borrower that each payment in years 1-3, is insufficient to pay all of the interest, let

28  alone, any of the principal.  The Loan Documents state under "BORROWERS FAILURE TO PAY AS

12

CLASS ACTION COMPLAINT

1  REQUIRED," that "[t]he amount of the charge will be 5.0000% [or other similar percentage] of *my*

2  *overdue payment of Principal and Interest*" (emphasis added). *See* Exhibits 1-3, ¶ 7(A). These partial

3  representations failed to disclose that the monthly payment amounts prescribed in the TILDS and also

4  stated in the Note (at paragraph 3(B) of Exhibits 1-3 of the attached Plaintiffs' Loan Documents and

5  similarly for each Class Member) were certain to result in negative amortization.

6       43.    The Loan Documents further state that, at ¶3E "my monthly payment *could be less* than

7  the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid

8  principal" (emphasis added) (*see* Exhibits 1-3, ¶3E) . However, the Loan Documents fail to disclose the

9  material fact that the payment schedules provided by Defendants in the TILDS could not possibly cover

10  the amount of interest due under *any* conceivable index rate plus the margin after the first 30 days.

11       44.    The Notes list an interest rate and a payment amount based on the initial teaser interest

12  rate. However, the TILDS Defendants gave to Plaintiffs and Class Members before they entered into

13  the subject loans included a schedule of payments (including that initial payment amount) but disclose a

14  different, much higher interest rate. By stating the low teaser rate and associated monthly payment in

15  the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule

16  based on the low teaser rate, Defendants failed to disclose the actual interest costs that borrowers were

17  going to accrue on their loans.

18       45.    Defendants purposefully and intentionally devised this Option ARM loan scheme of

19  stating only partially true facts and omitting important material information in order to deceive

20  consumers into believing that these loans would provide a low-interest rate for the first two to five years

21  of the Note and that, if they made their payments according to the payment schedule provided by

22  Defendants, this would be sufficient to pay both principal and interest.

23       46.    Defendants also actively concealed and failed to disclose information regarding the

24  payment caps associated with the loans, *and during the entire time the payment caps were in effect,*

25  *negative amortization was certain to occur if the payment schedule provided prior to entering into the*

26  *loans was followed*. Defendants knew or should have known that this loan product had a variable rate

27  with payment caps and that the Loan Documents omitted the Material Omissions, including that

28  negative amortization was a certainty. Defendants also knew or should have known that the loans were

guaranteed to result in negative amortization, because Defendants and COUNTRYWIDE accrued the
negative amortization as income for accounting and/or tax purposes. COUNTRYWIDE was also aware
the negative amortization was certain to occur, because, in computing the total finance charge payable
over the full life of the loan for purposes of compiling the TILDS, Defendants included the interest on
"deferred interest," which would accrue because the scheduled payments were insufficient to pay all
interest due on the loan. The loan documents did not disclose the fact that negative amortization was a
certainty, or the amount of the total finance charge that resulted from this negative amortization.

47. The only places in the Notes that even inferentially reference negative amortization
suggest that negative amortization was merely a possibility, rather than an absolute certainty. For
instance, Defendants stated in the Notes, at ¶ 3(E), that the borrower's "monthly payments could be less
than or greater than" necessary to cover all of the interest due on the Notes, which was a half-truth, and
intended to conceal the whole truth, because it did not state that the payment schedule provided by
Defendants would absolutely guarantee that negative amortization was going to occur on these loans.

48. The Loan Documents of Defendants were deceptive and misleading, in that the payments
for up to the first five years of the loans bear no relationship to the APR listed in the TILDS.

49. At all times relevant during the liability period, the Loan Documents were misleading,
omitted and concealed material information, and were unlawful, in that the Notes and TILDS did not
disclose that the liability that Plaintiffs and Class Members were incurring was substantially greater than
the amount of their scheduled payments.

50. Defendants failed to disclose to Plaintiffs and Class Members that the initial interest rate
was discounted, and that it was absolutely certain to substantially increase after only one month, even
when the index did not rise. To the extent that Defendants did in any way provide a disclosure stating
that the initial payment was not based on the index, they failed to do so in a manner that was clear and
conspicuous, and that did not obscure its importance, or that was designed to be reasonably understood
by the ordinary consumer. Rather than disclose that the interest rate would increase after only one
month, the Loan Documents stated that the initial payment was based on a "yearly rate" of 1-3%.

51. Defendants also failed to disclose to Plaintiffs and Class Members before they entered
into the subject Option ARM loans all of the ways by which the interest rate applicable to the subject

1   loans could increase.

2       52.    At all times relevant during the liability period, Defendants provided Plaintiffs and Class

3   Members with Notes that state: "I will pay interest at a yearly rate of [1.000% - 3.000%]." *See*

4   Exhibits 1-3, ¶2(A).   However, in the TILDS, the box entitled "ANNUAL PERCENTAGE RATE"

5   describes the APR as "[t]he cost of your credit as a yearly rate" and then lists a much higher APR than

6   the rate listed in the Notes.   For instance, in the case of Plaintiff DOROTHY PERALTA, the TILDS

7   listed an APR of "7.622." *See* Exhibit 1, TILDS.   For Plaintiff STEVEN BIGVERDI, the TILDS listed

8   an APR of "5.321." *See* Exhibit 2, TILDS.   For Plaintiff JAMES MOSCOSO, the TILDS listed an APR

9   of "6.145." *See* Exhibit 3, TILDS.

10      53.    Thus, the listed APR would actually conflict with the rate stated in the Notes.   For

11  instance, in the case of Plaintiff DOROTHY PERALTA the "2.000%" stated in the Note contradicts the

12  "7.622" APR that COUNTRYWIDE stated in the TILDS, and in the case of Plaintiff STEVEN

13  BIGVERDI, the "1.000%" stated in the Note contradicts the "5.321" APR that COUNTRYWIDE stated

14  in the TILDS.   And for Plaintiff JAMES MOSCOSO, the "1.000%" stated in the Note contradicts the

15  "6.145%" APR that COUNTRYWIDE stated in the TILDS.

16      54.    At all times relevant during the liability period, Defendants failed to clearly and

17  conspicuously explain in the Note or TILDS that the low rate (the same rate upon which Defendant

18  based the written payment schedule provided to Plaintiffs) was offered only for the first thirty (30) days

19  of the loan.

20      55.    Defendants also concealed and failed to disclose to Plaintiffs and Class Members that the

21  APR listed in the TILDS was not the APR used to determine the first five years of payments listed in the

22  very same TILDS, and that the listed payment amounts for the first five years of the loan were based on

23  the interest rate stated in the Note, an interest rate which was correct for no more than thirty days.

24      56.    The disclosures are required because they are material, and indeed, form the core basis

25  for Plaintiffs and Class Members to make an informed decision by comparing the cost of credit to other

26  proposals.   It therefore was incumbent upon Defendants to disclose to Plaintiffs and the Class members

27  before they entered into the subject Option ARM loans the composite interest rate, and the amount of

28  payments based thereon, so that these borrowers could understand exactly what they would be paying

15

1   for the loan.

2      57.   At all times relevant, COUNTRYWIDE had a duty to disclose to Plaintiffs and the Class

3   Members, before they entered into the subject Option ARM loans: (i) that the payment schedule for the

4   first two to five years was not based upon the APR listed on the TILDS; (ii) that negative amortization

5   will occur and that the "principal balance will increase"; (iii) that the initial interest rate on the Note was

6   discounted; and (iv) the applicable annual percentage rate ("APR").

7      58.   As a direct and proximate result of Defendant's failures to disclose and omission of

8   material facts, as alleged herein, Plaintiffs and Class Members have suffered damages, which include,

9   but are not limited to, the loss of equity in their homes, which Plaintiffs and each Class Member had in

10  their homes prior to entering these loans.

11     59.   The wrongful conduct of Defendant, as alleged herein, including Defendants' placing of

12  their corporate and/or individual profits over the rights of others , was willful, oppressive, immoral,

13  unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being

14  of Plaintiffs and Class Members, and particularly vile, base, contemptible, and wretched.  Such acts

15  and/or omissions were performed on the part of officers, directors, and/or managing agents of each

16  corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or

17  managing agents who authorized and/or ratified said acts and/or omissions.  Defendants thereby acted

18  with malice and complete indifference to and/or conscious disregard for the rights and safety of others,

19  including Plaintiffs and the general public. Accordingly, Plaintiffs and Class Members are entitled to an

20  award of punitive damages against Defendants in an amount to deter them from similar conduct in the

21  future.

22     60.   WHEREFORE, Plaintiffs and Class Members are entitled to all legal and equitable

23  remedies provided by law, including but not limited to actual damages, exemplary damages,

24  prejudgment interest and costs.

25  / / /

26  / / /

27  / / /

28  / / /

16

CLASS ACTION COMPLAINT

## VIII.

### SECOND CAUSE OF ACTION

#### Violation of California's Unfair Competition Law,

#### Bus. & Prof. Code §§ 17200 *et. seq.*

#### "Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices

#### (Against All Defendants)

61.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

62.     Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class Members, and in their capacity as private attorney generals against all Defendants for their unlawful, unfair, fraudulent and/or deceptive business acts and/or practices pursuant to California Business & Professions Code section 17200 *et seq.* ("UCL") which prohibits all unlawful, unfair and/or fraudulent business acts and/or practices.

63.     Plaintiffs assert these claims as they are representatives of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by California Business & Professions Code §§ 17200, *et seq.*

64.     Plaintiffs and Class Members were consumers who applied for mortgage loans through Defendants.  During the loan application process, in each case, Defendants uniformly failed to disclose and omitted material information that was known only to themselves and that could not reasonably have been discovered by Plaintiffs and Class Members as set forth in the preceding counts.

65.     Based on the Material Omissions and Defendants' other partially true statements and failures to disclose as alleged herein, Plaintiffs and Class Members agreed to finance their home through Defendants' Option ARM loans, and have been actually harmed.

66.     As a direct and proximate result of the Loan Documents they designed, Defendants intended that Plaintiffs and Class Members would be misled into believing that, if they made payments based on the payment schedule provided to them by Defendants before they entered into the subject loans, the principal balance would not increase with each payment when in fact it actually increased with each payment.

1    67.    By engaging in the above-described acts and practices, Defendants have committed one

2  or more acts of unfair competition within the meaning of Business & Professions Code §§ 17200, *et seq.*

3    68.    Defendants' misconduct, as alleged herein, gave them an unfair competitive advantage

4  over their competitors.

5    69.    Unlawful:  The unlawful acts and practices of Defendants alleged above constitutes

6  unlawful business acts and/or practices within the meaning of California Business & Professions Code

7  §§ 17200, *et seq.*  Defendants' unlawful business acts and/or practice as alleged herein have violated

8  numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said

9  predicate acts are therefore *per se* violations of §17200, *et seq.*  These predicate unlawful business acts

10  and/or practices include, but are not limited to, the following: California Civil Code §§ 1572 (Actual

11  Fraud - Omissions), 1573 (Constructive Fraud by Omission), and 1710 (Deceit), and other statutory and

12  common law in effect.

13    70.    Unfair: Defendants' omissions and misconduct as alleged in this action constitutes

14  negligence and other tortuous conduct and this misconduct gave Defendants an unfair competitive

15  advantage over their competitors.

16    71.    Defendants'  misconduct as alleged in the Material Omissions and otherwise herein

17  caused Plaintiffs and Class Members substantial injury by causing a resulting loss of equity in their

18  homes, because Defendants failed to disclose and/or omitted material information that the Option ARM

19  loans: 1) were certain to result in negative amortization if the disclosed payment schedule was followed;

20  2) had absolutely no countervailing benefit to consumers or to competition that could possibly outweigh

21  this substantial injury; and 3) caused  injury that could not have been avoided or even discovered by the

22  consumers, because it resulted from Defendants' failure to disclose and/or omission of material

23  information that only the Defendants knew or could have known.

24    72.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive

25  advantage over their competitors.

26    73.    Fraudulent: Through their omissions and/or acts, practices and non-disclosures as alleged

27  herein, Defendants designed the Loan Documents in order to deceive the public through the Material

28  Omissions leading to consumer confusion, including, but not limited to the fact that, for the first two to

1    five years, the loans were negatively amortizing loans. Said omissions, acts, practices and non-

2    disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the

3    meaning of California Business & Professions Code §§ 17200, *et seq.*

4          74.     Defendants' conduct, as fully described herein, was designed to and was therefore likely

5    to deceive members of the consuming public, and at all times, Defendants' failures to disclose and their

6    omission of material facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

7          75.     The harm to Plaintiffs, members of the general public and Class Members outweighs the

8    utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein

9    constitutes an unlawful business act or practice within the meaning of California Business & Professions

10    Code §§ 17200, *et seq.*

11         76.     As a direct and proximate result of the aforementioned omissions, acts and practices,

12    Defendants received monies and continue to hold the monies expended by Plaintiffs and Class Members

13    similarly situated who purchased the Option ARM loans as described herein.

14         77.     The unfair, deceptive and/or fraudulent business practices of Defendants, as fully

15    described herein, present a continuing threat to members of the public to be mislead and/or deceived by

16    Defendants' Loan Documents at issue, as described herein. Plaintiffs and other members of the general

17    public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from

18    occurring and/or reoccurring in the future.

19         78.     As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged

20    herein, Plaintiffs and Class Members have lost hundreds of thousands if not millions of dollars of equity

21    in their homes. Plaintiffs and Class members are direct victims of the Defendants' unlawful conduct,

22    and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair

23    competition.

24         79.     WHEREFORE, Plaintiffs and Class Members are entitled to equitable relief, including

25    restitution, restitutionary disgorgement of all profits accruing to Defendants because of the unfair,

26    fraudulent, and deceptive acts and/or practices, attorney's fees and costs, declaratory relief, and a

27    permanent injunction enjoining Defendants from the unfair, fraudulent and deceitful activity alleged

28    herein.

<div align="center">19</div>

# IX.

## THIRD CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

80.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

81.     Plaintiffs and Class Members entered into a written home loan agreement – the contract or Note – with Defendants which describe terms and respective obligations applicable to the parties herein.

82.     Defendants drafted the Notes and did not allow Plaintiffs or Class Members any opportunity to make changes to the Notes and, due to Defendants' superior bargaining position, the Notes were offered on a "take it or leave it" basis. As such, the Notes and the prepayment penalty riders to the Notes are contracts of adhesion.

83.     Each Note and TILDS expressly and impliedly required Defendants to apply Plaintiffs' and Class Members monthly payments to both principal and interest on a fully-amortized basis (*i.e.*, so that negative amortization would not occur) as long as those payments were in the amount reflected in the Note and the TILDS. The Notes and the TILDS identified the monthly payments Plaintiffs and the Class Members were required to make. Defendants were not permitted to impose or charge any different payment amount. As alleged herein, the Notes expressly state and/or imply that those payments would be applied to pay both principal and interest on the loan.

84.     Once Plaintiffs and Class Members entered into these loans, Defendants switched the interest rate charged on the loans to a much higher rate than the one they promised to Plaintiffs and Class Members as a "yearly rate." They also demanded payments in amounts that exceeded those permitted by the Notes.

85.     As a result of Defendants' breach of the agreement, Plaintiffs and Class Members have suffered harm. Plaintiffs and Class Members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and Class Members' principal loan balance. Furthermore, Defendants' breach has placed Plaintiffs and Class Members in danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and Class

Members' principal loan balances to increase and limited these consumers' ability to make their future house payments or obtain alternative home loan financing.

86.    At all times relevant, there existed a gross inequality of bargaining power between the parties to the Loan Documents.  At all times relevant, Defendants unreasonably and unconscionably exploited their superior bargaining position and knowledge and foisted upon Plaintiffs and Class Members extremely harsh, one-sided provisions in the contract, which Plaintiffs and Class Members were not made aware of and could not reasonably have comprehended (*e.g.*, Defendants' fraud and failures to disclose as alleged herein), and which attempt to severely limit Defendants' obligations under the contracts at the expense of Plaintiffs and Class Members, as alleged herein.

87.    WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief, compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

## X.

## FOURTH CAUSE OF ACTION

### Tortiuous Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against All Defendants)

88.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

89.    As a direct and proximate result of the omissions and failures to disclose as alleged herein, Plaintiffs and Class members reasonably expected that their payments for the first two to five years of Defendants' loans would lower the balance due under the loans, thereby building up Plaintiffs' and the Class Members' equity in their homes.

90.    At all times relevant during the liability period, Defendants consciously and deliberately failed to apply Plaintiffs' and Class Members' payments in accordance with the reasonable expectations of Plaintiffs and the Class Members and uniformly misapplied the payments therein, which unfairly frustrated the agreed common purposes and disappointed the reasonable expectations of Plaintiffs and Class Members.

/ / /

91.     Defendants uniformly and unfairly interfered with Plaintiffs' and Class Members' rights to receive the principal benefit of the contract, *i.e.*, ownership of their homes. Defendants' loans have stripped away a substantial portion of the equity Plaintiffs and Class Members had in their homes and, in some cases, have actually resulted in the complete loss of their homes through foreclosure.

92.     Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about the Option ARM loans at issue, and sold these Option ARM loans at issue throughout the State of California, including Alameda County.

93.     Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiffs and the general public.

94.     At all times relevant, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

95.     As a result of Defendants' conduct, Plaintiffs and Class Members have suffered harm. Plaintiffs and Class Members have incurred significantly increased debt that is secured by their homes. Plaintiffs and Class members also have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest that is added to their principal loan balances. Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and Class Members in danger of losing their homes through foreclosure and limited these consumers' ability to obtain alternative home loan financing.

96.     WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief, all damages proximately caused by Defendants' breach of the implied covenant of good faith and fair dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

/ / /

/ / /

## XI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and all Class Members pray for judgment against each Defendant, jointly and severally, as follows:

A.    An order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.    For actual damages according to proof;

C.    For compensatory damages as permitted by law;

D.    For consequential damages as permitted by law;

E.    For punitive damages as permitted by law;

F.    For equitable relief, including restitution;

G.    For restitutionary disgorgement of all profits Defendant obtained as a result of their unfair competition;

H.    For interest as permitted by law;

I.    For Declaratory Relief;

J.    For reasonable attorneys' fees and costs; and

K.    For such other relief as is just and proper.

DATED: June 2, 2009                          **SMOGER & ASSOCIATES**

By: _____
Gerson H. Smoger, Esq.
Steven M. Bronson, Esq.
Mark T. Baller, Esq.
3175 Monterey Blvd
Oakland, CA, 94602-3560
Tel:  (510) 531-4529
Fax: (510) 531-4377

Jonathan Shub, Esq.
Miriam L. Schimmel
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19107
Phone: (215) 564-2300
Fax     (215) 851-8029

23

CLASS ACTION COMPLAINT

David M. Arbogast, Esq.
Jeffrey K. Berns, Esq.
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000
Fax:    (818) 654-5988

Attorneys for Plaintiffs and all others Similarly
Situated

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

DATED: June 2, 2009

                                    **SMOGER & ASSOCIATES**

                              By: _____
                                    Gerson H. Smoger, Esq.
                                    Steven M. Bronson, Esq.
                                    Mark T. Baller, Esq.
                                    3175 Monterey Blvd
                                    Oakland, CA, 94602-3560
                                    Tel:  (510) 531-4529
                                    Fax: (510) 531-4377

                                    Jonathan Shub, Esq.
                                    Miriam L. Schimmel
                                    **SEEGER WEISS LLP**
                                    1515 Market Street, Suite 1380
                                    Philadelphia, PA 19107
                                    Phone: (215) 564-2300
                                    Fax    (215) 851-8029

                                    David M. Arbogast, Esq.
                                    Jeffrey K. Berns, Esq.
                                    **ARBOGAST & BERNS LLP**
                                    19510 Ventura Boulevard, Suite 200
                                    Tarzana, California 91356
                                    Phone: (818) 961-2000
                                    Fax:    (818) 654-5988

                                    Attorneys for Plaintiffs and all others Similarly
                                    Situated

24

CLASS ACTION COMPLAINT



# EXHIBIT NO. 1

**EXHIBIT 1**

Loan Administration   8/15/2007 9:00 AM   PAGE   2/005   805-520-5019

Prepared by: ANANT JIEMJITPOLCHAI

LOAN #: 110755483

# ADJUSTABLE RATE NOTE
(MTA - Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

AUGUST 19, 2005          ORANGE          CALIFORNIA
       [Date]             [City]            [State]

1412 TORRANCE BLVD, TORRANCE, CA 90501-2353
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 420,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed          115   percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is AMERICA'S WHOLESALE LENDER.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
   (A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   2.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

   (B)  Interest Rate Change Dates
The interest rate I will pay may change on the first          day of OCTOBER, 2005          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

   (C)  Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

   (D)  Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 375/1000          percentage point(s) .   3.375 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**
   (A)  Time and Place of Payments
I will make a payment every month.

I will make my monthly payments on the first          day of each month beginning on OCTOBER 01, 2005          . I will make these payments every month until I have paid all the Principal and interest and any

* PayOption ARM Note - H7A Index
2E302-XX (12/04)(d)          Page 1 of 4




LIMITED TITLE COMPANY

Loan Administration   8/15/2007 9:00 AM   PAGE   3/005   805-520-5019

LOAN #: 110755483

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **SEPTEMBER 01, 2036** , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
**P.O. Box 10219, Van Nuys, CA 91410-0219**
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$**1,581.97** , unless adjusted under Section 3(F).

**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(F) below beginning on the **first** day of **OCTOBER, 2006** , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to **ONE HUNDRED FIFTEEN** percent ( **115 %** ) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
   (i)   Interest Only Payments: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
   (ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.
   (iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

♦ PayOption ARM Note – MTA Index
31059-XX (1/04)       Page 2 of 6

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL
BY G. G.
UNITED TITLE COMPANY

LOAN #: 110755453

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4. *NOTICE OF CHANGES***

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL
BY G.G.
UNITED TITLE COMPANY

LOAN #: 110755453

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_Dorothy Peralta_
DOROTHY PERALTA                                          - Borrower

_____                          - Borrower

_____                          - Borrower

_____                          - Borrower

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL
BY _____ G.G.
UNITED TITLE COMPANY

Loan Administration   8/15/2007 8:54 AM   PAGE   2/004   805-520-5019

Prepared by: ANANT JEMJITPOLCHAI

## TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: AMERICA'S WHOLESALE LENDER

☐ Preliminary   ☒ Final

4500 Park Granada
Calabasas, CA 91302

DATE 08/19/2005

BORROWERS: DOROTHY PERALTA

LOAN 110755453
CASE NO.
Type of Loan CONV INSURED
NCARE RTA 1mo Intro
PO 3yrSPP

ADDRESS      1412 TORRANCE BLVD
CITY STATE / ZIP TORRANCE, CA 90501-2353
PROPERTY     1412 TORRANCE BLVD
             TORRANCE, CA 90501-2353

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.622 % | $ 709,133.45 | $ 417,029.00 | $ 1,117,162.45 |

PAYMENT SCHEDULE

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 1,963.60 | MONTHLY BEGINNING 10/01/2005 |
| 12 | 2,082.25 | MONTHLY BEGINNING 10/01/2006 |
| 12 | 2,209.80 | MONTHLY BEGINNING 10/01/2007 |
| 12 | 2,346.91 | MONTHLY BEGINNING 10/01/2008 |
| 12 | 2,494.31 | MONTHLY BEGINNING 10/01/2009 |
| 84 | 3,353.24 | MONTHLY BEGINNING 10/01/2010 |
| 213 | 3,176.61 | MONTHLY BEGINNING 12/01/2017 |
| 1 | 3,167.44 | LAST PAYMENT DUE  03/01/2035 |
|  |  |  |
|  | PAYMENT AMOUNT SHOWN ABOVE INCLUDES<br>MONTHLY MORTGAGE INSURANCE PREMIUM. |  |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:

1412 TORRANCE BLVD, TORRANCE, CA 90501-2353

ASSUMPTION: Someone buying this property   ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard Insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15      days late, you will be charged a late charge of      5.000 % of the overdue payment

PREPAYMENT: If you pay off your loan early, you
☒ may  ☐ will not  have to pay a penalty.
☒ may  ☐ will not  be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_Dorothy Peralta_      8/26/05
DOROTHY PERALTA      BORROWER/DATE      BORROWER/DATE

BORROWER/DATE      BORROWER/DATE

FHAVA0XXW
* Truth in Lending Disclosure
2C299-UK (06/04)(d)

Page 1 of 2

04-28-2008   04:13am   From-Countrywide Lancaster                          661                    T-738   P.030/054   F-320

Prepared by AMMET JERASTERLOWS                    **AMERICA'S WHOLESALE LENDER**

DATE       06/15/2005
BORROWER:  DOROTHY WHALEN
CASE #:
LOAN #:    114754653
PROPERTY ADDRESS: 1412 TURNBER BLVD
                  TORRENCE, CA 90501-3153

## PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated    JUNE 15, 2005          , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to AMERICA'S WHOLESALE LENDER (the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayment of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under this Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first THREE (3) months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment.

• Multistate Prepayment Penalty Addendum
•[illegible]                                    Page 1 of 2

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL.
BY_____
NOTED TELECOMPANY

30

Case 4:09-cv-03256-PJH   Document 1-1   Filed 07/17/09   Page 35 of 121

Prepared by: ROBERT JERLSTROM



AMERICA'S WHOLESALE LENDER

DATE:  08/26/2008
BORROWER: DOROTHY PERAZZA
CASE #:
LOAN #:  110799453
PROPERTY ADDRESS: 1412  TORRANCE BLVD
                  TORRANCE, CA 90501-3353

Branch #: 0060319
43 WEST LAKE AVENUE #150
HANCOCK, CA 91106
Phone:  (626)421-6586
Br No, No.: (697) 795-3413

## ADJUSTABLE RATE MORTGAGE (ARM) LOAN PROGRAM DISCLOSURE
### MONTHLY TREASURY AVERAGE INDEX (MTA) - PAYMENT CAPS

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

- Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin.
- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve listed in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yield"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
- Your initial interest rate is not based on the Index used to make later adjustments. Please ask us for the amount of our current interest rate discount.
- For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below.

| Your interest rate can change | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
|---|---|---|
| Each time your interest rate changes, the new interest rate will equal the sum of the Index plus the margin, subject to the following limits | • Your interest rate will be rounded to the nearest 1/8%. <br> • Your interest rate will never exceed the maximum set forth in your loan documents. The maximum rate will not be more than 9.95%. Please ask us for our current maximum rate. | |
| Your payment can change | • Every year and can increase or decrease substantially based on changes in the interest rate. <br> • At every 6th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date. | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the Index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as interest | Beginning with the 13th payment and every 12 months thereafter, we will recalculate the amount of the Full payment and the limited payment. The full payment will be the amount sufficient to pay the unpaid balance in full by the maturity date of the loan and to offset during the month preceding the payment change date. The limited payment will be your payment for the month preceding the payment adjustment date increased by 7.5%. You will then have the option each month of paying the lesser of the loan, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. If you are making less than the full Payment, this means the full payment is not enough to cover the interest due, the deficiency will be added to your loan amount. This means the balance of your loan could increase. This is known as "negative amortization". | |
| The unpaid principal of your loan | • Can never exceed 115% (125% in New York) of the original amount borrowed, whether you limit your payment or pay the full payment. If that limit is reached, your monthly payment amount will be changed to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan. | |

COSV
© ARM BCL Pay Option Disclosure
4Dyna-US (04/05)(d)                                   Page 1 of 3







LOAN #: 130756453

The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January 2008   , and assume the maximum periodic increases in rates and payments.

| | | |
|---|---|---|
| Initial Interest Rate | 1.000 % | 1.750 % |
| Maximum Interest Rate | 9.950 % | 7.366 % |
| First Year Payment | $32.16 | $35.73 |
| Maximum payment | $102.60   in the 3rd year | $162.16   in the 3rd year |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $80,000 MTA ARM index - Payment Cap loan with a discounted interest rate would be: $80,000/$10,000 = 8 x $102.60 = $609.48 per month)

_Dorothy Peralta_   _8/24/05_
Applicant                                      Date
DOROTHY PERALTA

_____
Applicant                                      Date

_____
Applicant                                      Date

_____
Applicant                                      Date

D288V
* AdbustPk Pay Option Disclosure
1DE26.UD (04/05)                         Page 8 of 8

2

# EXHIBIT NO. 2

EXHIBIT 2

Prepared by: ANIK NORTIKYAN

LOAN #: 99042769

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

| APRIL 07, 2005 | HERMOSA BEACH | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

1220 NORTH GRIFFITH PARK DRIVE, BURBANK, CA 91506-1144
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 408,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed 115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is Countrywide Bank, a Division of Treasury Bank, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the first day of JUNE, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO & SEVEN-EIGHTHS percentage point(s) 2.875 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on JUNE 01, 2005. I will make these payments every month until I have paid all the Principal and interest and any

* PayOption ARM Note - MTA Index
2E306-XX (12/04)(d)                                    Page 1 of 4





LOAN #: 99042769

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   MAY 01, 2035         , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,312.29         , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the first          day of JUNE, 2006         , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN          percent ( 115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and Interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
(i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.
(iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

LOAN #: 99042769

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.   NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000  % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

LOAN #: 99042769

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

| | |
|---|---|
| STEVEN S. BIGVERDI | - Borrower |
| | - Borrower |
| | - Borrower |
| | - Borrower |

Prepared by: ANIK NORTIKYAN

**Countrywide Bank, a Division of Treasury Bank, N.A.**

DATE:        04/07/2005
BORROWER: STEVEN S. BIGVERDI
CASE #:
LOAN #:      99042769
PROPERTY ADDRESS: 1220 NORTH GRIFFITH PARK DRIVE
                 BURBANK, CA 91506-1144

Branch #: 0000918
55 SOUTH LAKE AVENUE #150
PASADENA, CA 91101
Phone: (626)431-2555
Br Fax No.: (626)792-3411

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated   APRIL 07, 2005        , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to
Countrywide Bank, a Division of Treasury Bank, N.A.
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

**BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first THIRTY SIX months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment.

● Multistate Prepayment Penalty Addendum
1E298-XX (01/05)(d)

Page 1 of 2





Prepared by: AMX MORTGAGE

## TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, a Division of Treasury Bank, N.A.

☐ Preliminary   ☒ Final
DATE 04/07/2009

1199 North Fairfax St. Ste.500
Alexandria, VA 22314

BORROWERS: STEVEN E BECVEROZ

LOAN 39042769
CASE NO.
Type of Loan CONV UNINSURED
NCAMR MTA Imp Intro
PG SysPMY

ADDRESS      1126 WINCHESTER AVE #106
CITY STATE / ZIP GLENDALE, CA 91201
PROPERTY     1228 NORTH GRIFFITH PARK DRIVE
             BURBANK, CA 91506-1144

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 5.321 % | $ 452,940.35 | $ 403,017.60 | $ 855,958.03 |

PAYMENT SCHEDULE IS:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 1,313.29 | MONTHLY BEGINNING 06/01/2008 |
| 12 | 1,410.79 | MONTHLY BEGINNING 06/01/2004 |
| 12 | 1,516.51 | MONTHLY BEGINNING 06/01/2007 |
| 12 | 1,630.28 | MONTHLY BEGINNING 06/01/2008 |
| 11 | 1,752.55 | MONTHLY BEGINNING 06/01/2009 |
| 299 | 2,543.30 | MONTHLY BEGINNING 06/01/2010 |
| 1 | 2,545.97 | LAST PAYMENT DUE 05/01/2035 |

DEMAND FEATURE:   ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
1228 NORTH GRIFFITH PARK DRIVE, BURBANK, CA 91506-1144

ASSUMPTION: Someone buying this property   ☐ cannot assume the remaining balance due under original mortgage terms.
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard Insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15 days late, you will be charged a late charge of 5.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☒ may   ☒ will not   have to pay a penalty.
☐ may   ☒ will not   be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
* means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____ /BORROWER/DATE      _____ /BORROWER/DATE
STEVEN E BECVEROZ

_____ /BORROWER/DATE      _____ /BORROWER/DATE

FNMA/CONV
# Truth in Lending Disclosure
2C204-US (04/04/03)

Page 1 of 1



LOAN #: 99042769

| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January, 2004 and assume the maximum periodic increases in rates and payments. | |
|---|---|---|
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | 1.25 % | 1.75 % |
| Maximum Interest Rate | 9.95 % | 9.95 % |
| First Year Payment | $ 33.33 | $ 35.72 |
| Maximum payment | $ 101.70    In the 6th year | $ 102.14    In the 6th year |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $60,000 MTA ARM Index - Payment Cap loan with a discounted interest rate would be: $60,000 / $10,000 = 6; 6 x $36.71 = $220.26 per month)

Applicant                                                      Date
STEVEN S. BIGVERDI


Applicant                                                      Date


Applicant                                                      Date


Applicant                                                      Date

# EXHIBIT NO. 3

**EXHIBIT 3**

# EXHIBIT NO. 3

*EXHIBIT 3*

Prepared by: CARLOS E. ESCOBAR

LOAN #: 113595977

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

| SEPTEMBER 12, 2005 | CASTRO VALLEY | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

30482 OAKMONT WAY, HAYWARD, CA 94544
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 199,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ____115____ percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is Countrywide Bank, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B) Interest Rate Change Dates   /

The interest rate I will pay may change on the **first**        day of **NOVEMBER, 2005**        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3..

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO & SEVEN-EIGHTHS        percentage point(s)   2.875 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than    9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the **first**        day of each month beginning on .

NOVEMBER 01, 2005        . I will make these payments every month until I have paid all the Principal and interest and any

\* PayOption ARM Note - MTA Index
2E308-XX (12/04)(d)                                        Page 1 of 4




LOAN #: 113595977

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    OCTOBER 01, 2035    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$ 640.06                  , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first              day of NOVEMBER, 2006   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN              percent
(     115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.

(iii)  15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

* PayOption ARM Note - MTA Index
2E306-XX (12/04)                    Page 2 of 4

LOAN #: 113595977

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after' the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000  % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

LOAN #: 113595977

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_____

JAMES MOSCOSO                                              - Borrower

_____

                                                          - Borrower

_____

                                                          - Borrower

_____

                                                          - Borrower

Prepared by: CARLOS E. ESCOBAR

# TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, N.A.

☐ Preliminary   ☒ Final

1199 North Fairfax St. Ste.500
Alexandria, VA 22314

DATE 09/12/2005

BORROWERS: JAMES MOSCOSO

LOAN CASE NO.   113595977

Type of Loan CONV UNINSURED
NCARM MTA 1mo Intro
PO 3yrHPP

ADDRESS       30482 OAKMONT WAY
CITY STATE / ZIP HAYWARD, CA 94544
PROPERTY      30482 OAKMONT WAY
              HAYWARD, CA 94544

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.145 % | $ 262,321.66 | $ 191,810.90 | $ 454,132.56 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 640.06 | MONTHLY BEGINNING 11/01/2005 |
| 12 | 688.06 | MONTHLY BEGINNING 11/01/2006 |
| 12 | 739.66 | MONTHLY BEGINNING 11/01/2007 |
| 12 | 795.13 | MONTHLY BEGINNING 11/01/2008 |
| 12 | 854.76 | MONTHLY BEGINNING 11/01/2009 |
| 299 | 1,365.08 | MONTHLY BEGINNING 11/01/2010 |
| 1 | 1,361.60 | LAST PAYMENT DUE 10/01/2035 |
| | | |
| | | |
| | | |
| | | |
| | | |

DEMAND FEATURE: ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:

30482 OAKMONT WAY, HAYWARD, CA 94544

ASSUMPTION: Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard Insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15   days late, you will be charged a late charge of     5.000 % of the overdue payment

PREPAYMENT: If you pay off your loan early, you
☒ may   ☐ will not   have to pay a penalty.
☐ may   ☒ will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
● means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____   BORROWER/DATE        _____   BORROWER/DATE

JAMES MOSCOSO                                   KAREN MOSCOSO

_____   BORROWER/DATE        _____   BORROWER/DATE

FHA/VA/CONV
● Truth in Lending Disclosure
2C299-US (08/04)(d)

Page 1 of 2





Prepared by: CARLOS E. ESCOBAR

**Countrywide Bank, N.A.**

DATE:          09/12/2005
BORROWER: JAMES MOSCOSO
CASE #:
LOAN #:      113595977
PROPERTY ADDRESS: 30482 OAKMONT WAY
                           HAYWARD, CA 94544

Branch #: 0000931
3201 DANVILLE BLVD, SUITE 177
ALAMO, CA 94507
Phone: (925) 552-4740
Br Fax No.: (925) 552-7004

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated SEPTEMBER 12, 2005 , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to Countrywide Bank, N.A.
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "BORROWER'S RIGHT TO PREPAY" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. Such an advance payment of Principal is known as a "Prepayment." I may make partial or full Prepayments. When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. **My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.**

● Prepayment Penalty Addendum
1E337-XX (12/04)(d)

Page 1 of 2





- Your interest rate will be based on an index plus a margin. Please ask us for our current interest rate and margin.

- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

- Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts.

- For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below.

| | HOW YOUR INTEREST RATE CAN CHANGE (1 month) | HOW YOUR INTEREST RATE CAN CHANGE (3 months) |
|---|---|---|
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br><br>• Your interest rate will never exceed the maximum set forth in your loan documents. The maximum rate will not be more than 9.95%. Please ask us for our current maximum rate. | |
| | HOW YOUR PAYMENT CAN CHANGE | |
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate.<br><br>• At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date./ | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amounts of the full payment and the limited payment. The full payment will be the amount sufficient to pay the unpaid balance in full by the maturity date at the interest rate in effect during the month preceding the payment change date. The limited payment will be your payment for the month preceding the payment change date increased by 7.5%. You will then have the choice each month of paying the lesser of the two, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. If you pay anything less than the Full Payment, which would not be sufficient to cover the interest due, the difference will be added to your loan amount. This means the balance of your loan could increase. This is known as "negative amortization". | |
| The unpaid principal of your loan: | • Can never exceed 115% (110% in New York) of the original amount borrowed, whether you limit your payment or pay the full payment. If that limit is reached, your monthly payment amount will be changed to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan. | |





*would be: $60,000 / $10,000 = 6; 6 x $ 101.58*   = $609.48   *per month)*

Applicant   Date
JAMES MOSCOSO

Applicant   Date

Applicant   Date

Applicant   Date

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Gerson H. Smoger, Esq. (SBN 79196)<br>SMOGER & ASSOCIATES<br>3175 Monterey Blvd., Ste. 3<br>Oakland, CA 94602<br>TELEPHONE NO.: (510) 531-4529    FAX NO.: (510) 531-4377<br>ATTORNEY FOR *(Name):* Plaintiffs Peralta, Bigverdi, Moscoso & all others sim. sit. | *7645024* |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Alameda
STREET ADDRESS: ALAMEDA COUNTY SUPERIOR COURT
MAILING ADDRESS: 1225 FALLON STREET
CITY AND ZIP CODE: OAKLAND CA 94612-4280
BRANCH NAME:

**FILED**
**ALAMEDA COUNTY**
JUN 0 3 2009
CLERK OF THE SUPERIOR COURT
By *Sasha Plank*   Deputy

CASE NAME:
Peralta et al. v. Countrywide Home Loans, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: RG 09455493 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)  [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/Unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [✓] Fraud (16) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is  [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties        d. [✓] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel       e. [ ] Coordination with related actions pending in one or more courts
        issues that will be time-consuming to resolve                in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence         f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action *(specify):* Four
5. This case [✓] is  [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: June 2, 2009

Gerson H. Smoger, Esq.
_____ (TYPE OR PRINT NAME)    ▶ _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com



CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)--Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) (*if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto*)

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability (*not asbestos or toxic/environmental*) (24)
Medical Malpractice (45)
   Medical Malpractice--
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) (*not civil harassment*) (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract (*not unlawful detainer or wrongful eviction*)
   Contract/Warranty Breach--Seller
      Plaintiff (*not fraud or negligence*)
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case--Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage (*not provisionally complex*) (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property (*not eminent domain, landlord/tenant, or foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ--Administrative Mandamus
   Writ--Mandamus on Limited Court
      Case Matter
   Writ--Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal--Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400--3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   (*arising from provisionally complex case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment (*non-domestic relations*)
   Sister State Judgment
   Administrative Agency Award
      (*not unpaid taxes*)
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified above*) (42)
   Declaratory Relief Only
   Injunctive Relief Only (*non-harassment*)
   Mechanics Lien
   Other Commercial Complaint
      Case (*non-tort/non-complex*)
   Other Civil Complaint
      (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition (*not specified above*) (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
      Claim
   Other Civil Petition



F. ADDENDUM TO CIVIL CASE COVER SHEET

*Unified Rules of the Superior Court of California, County of Alameda*

| Short Title: | Case Number: |
|---|---|
| PERALTA, ET AL v. COUNTRYWIDE HOME LOANS, INC., ET AL | |

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW UNLIMITED CIVIL CASE FILINGS IN THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

[ ] Oakland, Rene C. Davidson Alameda County Courthouse (446)  [ ] Hayward Hall of Justice (447)  [ ] Pleasanton, Gale-Schenone Hall of Justice (448)

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | | |
|---|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] | 34 | Auto tort (G)<br>Is this an uninsured motorist case? [ ] yes [ ] no |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] | 75 | Asbestos (D) |
| | Product liability (24) | [ ] | 89 | Product liability (not asbestos or toxic tort/environmental) (G) |
| | Medical malpractice (45) | [ ] | 97 | Medical malpractice (G) |
| | Other PI/PD/WD tort (23) | [ ] | 33 | Other PI/PD/WD tort (G) |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] | 79 | Bus tort / unfair bus. practice (G) |
| | Civil rights (08) | [ ] | 80 | Civil rights (G) |
| | Defamation (13) | [ ] | 84 | Defamation (G) |
| | Fraud (16) | [✓] | 24 | Fraud (G) |
| | Intellectual property (19) | [ ] | 87 | Intellectual property (G) |
| | Professional negligence (25) | [ ] | 59 | Professional negligence - non-medical (G) |
| | Other non-PI/PD/WD tort (35) | [ ] | 03 | Other non-PI/PD/WD tort (G) |
| Employment | Wrongful termination (36) | [ ] | 38 | Wrongful termination (G) |
| | Other employment (15) | [ ] | 85 | Other employment (G) |
| | | [ ] | 53 | Labor comm award confirmation |
| | | [ ] | 54 | Notice of appeal - L.C.A. |
| Contract | Breach contract / Wrnty (06) | [ ] | 04 | Breach contract / Wrnty (G) |
| | Collections (09) | [ ] | 81 | Collections (G) |
| | Insurance coverage (18) | [ ] | 86 | Ins. coverage - non-complex (G) |
| | Other contract (37) | [ ] | 98 | Other contract (G) |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] | 18 | Eminent domain / Inv Cdm (G) |
| | Wrongful eviction (33) | [ ] | 17 | Wrongful eviction (G) |
| | Other real property (26) | [ ] | 36 | Other real property (G) |
| Unlawful Detainer | Commercial (31) | [ ] | 94 | Unlawful Detainer - commercial | Is the deft. in possession of the property? [ ] Yes [ ] No |
| | Residential (32) | [ ] | 47 | Unlawful Detainer - residential | |
| | Drugs (38) | [ ] | 21 | Unlawful detainer - drugs | |
| Judicial Review | Asset forfeiture (05) | [ ] | 41 | Asset forfeiture |
| | Petition re: arbitration award (11) | [ ] | 62 | Pet. re: arbitration award |
| | Writ of Mandate (02) | [ ] | 49 | Writ of mandate |
| | | | | Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No |
| | Other judicial review (39) | [ ] | 64 | Other judicial review |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] | 77 | Antitrust / Trade regulation |
| | Construction defect (10) | [ ] | 82 | Construction defect |
| | Claims involving mass tort (40) | [✓] | 78 | Claims involving mass tort |
| | Securities litigation (28) | [ ] | 91 | Securities litigation |
| | Toxic tort / Environmental (30) | [ ] | 93 | Toxic tort / Environmental |
| | Ins covrg from cmplx case type (41) | [ ] | 95 | Ins covrg from complex case type |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] | 19 | Enforcement of judgment |
| | | [ ] | 08 | Confession of judgment |
| Misc Complaint | RICO (27) | [ ] | 90 | RICO (G) |
| | Partnership / Corp. governance (21) | [ ] | 88 | Partnership / Corp. governance (G) |
| | Other complaint (42) | [ ] | 68 | All other complaints (G) |
| Misc. Civil Petition | Other petition (43) | [ ] | 06 | Change of name |
| | | [ ] | 69 | Other petition |

⌐ Smoger and Associates                                    ⌐ Countrywide Home Loans, Inc.
  Attn: Smoger, Gerson H.
  3175 Monterey Blvd.
  Suite #3
L Oakland, CA   94602                                      L

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Peralta<br>            Plaintiff/Petitioner(s)<br>      VS.<br><br>Countrywide Home Loans, Inc.<br>            Defendant/Respondent(s)<br>    (Abbreviated Title) | No. RG09455493<br><br><br>NOTICE OF HEARING |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

> Complex Determination Hearing
> Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 07/20/2009    TIME: 03:00 PM    DEPARTMENT: 17
LOCATION:  Administration Building, Third Floor
            1221 Oak Street, Oakland

Case Management Conference:
DATE: 08/18/2009    TIME: 03:00 PM    DEPARTMENT: 17
LOCATION:  Administration Building, Third Floor
            1221 Oak Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 4.2 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 17 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 267-6933.  Please consult Appendix E to Local Rules 4 and 5 of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 17.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be

scheduled for hearing in Department 17.

If the information contained in this notice requires change or clarification, please call the courtroom clerk for Department 17 at (510) 267-6933.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated: 06/05/2009                                Executive Officer / Clerk of the Superior Court

                              By

                                                      _____
                                                                              Deputy Clerk

---

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 06/05/2009.

                              By

                                                      _____
                                                                              Deputy Clerk



*7633354*

1 **SMOGER & ASSOCIATES**
Gerson H. Smoger (SBN 79196)
2 gersonsmoger@gmail.com
Steven M. Bronson (SBN 246751)
3 steven.bronson@gmail.com
Mark T. Baller (SBN 261331)
4 markballer@gmail.com
3175 Monterey Blvd
5 Oakland, CA, 94602-3560
Phone: (510) 531-4529
6 Fax: (510) 531-4377

7 **SEEGER WEISS LLP**
Jonathan Shub (SBN 237708)
8 jshub@seegerweiss.com
Miriam L. Schimmel (SBN 185089)
9 mschimmel@seegerweiss.com
1515 Market Street, Suite 1380
10 Philadelphia, PA 19107
Phone: (215) 564-2300
11 Fax (215) 851-8029

**ARBOGAST & BERNS LLP**
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns, Esq. (SBN 131351)
jberns@law111.com
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000
Fax: (818) 654-5988

FILED
ALAMEDA COUNTY

JUN 1 4 2009

Lisa Burnet

12 Attorneys for Plaintiffs and all others similarly situated.

13

14 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15 **COUNTY OF ALAMEDA**

16

17 DOROTHY PERALTA, STEVEN S.
BIGVERDI and JAMES MOSCOSO, on behalf
of themselves and others similarly situated,
18

19 Plaintiffs,

20 v.

21

22 COUNTRYWIDE HOME LOANS, INC. f/k/a
AMERICAS WHOLESALE LENDER,
COUNTRYWIDE HOME LOANS, INC., and
23 COUNTRYWIDE BANK, FSB; and DOES 1
through 200, inclusive,

24

25 Defendants.

26

27

28

**CASE NO. RG09455493**

**FIRST AMENDED CLASS ACTION
COMPLAINT FOR:**

(1) **Fraudulent Omissions;**

(2) **Violation of Bus. & Prof. Code §17200, *et
seq*. – "Unlawful," "Unfair" and
"Fraudulent" Business Practices;**

(3) **Breach of Contract; and**

(4) **Tortious Breach of the Covenant of Good
Faith and Fair Dealing.**

**JURY TRIAL DEMANDED**

FIRST AMENDED CLASS ACTION COMPLAINT

1    Plaintiffs, DOROTHY PERALTA, STEVEN S. BIGVERDI and JAMES MOSCOSO,

2    individually, and on behalf of all others similarly situated, allege as follows:

3                                            **I.**

4                                    **INTRODUCTION**

5         1.    This is an action pursuant to California's Unfair Competition Law (the "UCL"), Bus. &

6    Prof. Code §§ 17200, *et seq.,* and other California statutory and common law.  Plaintiffs STEVEN S.

7    BIGVERDI, and DOROTHY PERALTA, and JAMES MOSCOSO ("Plaintiffs"), individually, and on

8    behalf of all others similarly situated, bring this action against COUNTRYWIDE HOME LOANS, INC.

9    f/k/a AMERICA'S WHOLESALE LENDER, COUNTRYWIDE HOME LOANS, INC., and

10   COUNTRYWIDE BANK, FSB; and DOES 1 through 200 ("COUNTRYWIDE" or "Defendants"),

11   based upon Defendants' non-disclosure and fraudulent concealment of material information relating to

12   Defendants' Option Adjustable Rate Mortgage ("Option ARM") loan documents, and in the

13   accompanying required disclosure statements, including: (i) the actual interest rate on the note(s); (ii)

14   that the initial interest rate disclosed in the Note would last only one month, was discounted, and was

15   substantially lower than the actual interest that Plaintiffs and Class members would be charged on the

16   Notes; (iii) that the amount of monthly payments provided for in the Note and for the first 2-5 years in

17   the Truth in Lending Disclosure Statement ("TILDS") was based entirely on the "teaser" rate; and (iv)

18   that, after one month the scheduled monthly payment would not be sufficient to even pay the interest

19   being charged, let alone amortize the loan, so that each month the principal balance would increase even

20   if the payments were made as scheduled.  (Hereinafter, (i) through (iv) shall be referred to as "The

21   Material Omissions").

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

---

FIRST AMENDED CLASS ACTION COMPLAINT

## II.

## THE PARTIES

2.      Plaintiff, DOROTHY PERALTA is, and at all times relevant to this Complaint was, an individual residing in Torrance, California. On or about August 19, 2005, Plaintiff entered into an Option ARM loan agreement with COUNTRYWIDE. The Option ARM loan was secured by Plaintiff's residence. Attached hereto as Exhibit 1 is a true and correct copy of the Note, Truth and Lending Disclosure Statement ("TILDS") and Program Disclosure (collectively the "Loan Documents"), pertinent to this action.

3.      Plaintiff, STEVEN S. BIGVERDI is, and at all times relevant to this Complaint was, an individual residing in Los Angeles County, California. On or about April 7, 2005, Plaintiff refinanced his existing home loan and entered into an Option ARM home loan agreement with COUNTRYWIDE which was secured by Mr. Bigverdi's residence. Attached hereto as Exhibit 2 is a true and correct copy of the Loan Documents.

4.      Plaintiff, JAMES MOSCOSO is, and at all times relevant to this Complaint was, an individual residing in Hayward, California. On or about September 12, 2005, Plaintiff entered into an Option ARM loan agreement with COUNTRYWIDE. The Option ARM loan was secured by Plaintiff's residence. Attached hereto as Exhibit 3 is a true and correct copy of the Loan Documents.

5.      Plaintiffs are informed, believe, and thereon allege, that Defendants COUNTRYWIDE HOME LOANS, INC. f/k/a AMERICA'S WHOLESALE LENDER, COUNTRYWIDE HOME LOANS, INC., and COUNTRYWIDE BANK, FSB (collectively "COUNTRYWIDE") are, and at all material times relevant to this Complaint were, qualified to do business in California. Defendant COUNTRYWIDE HOME LOANS, INC. ("CHL") is a corporation incorporated in the State of New York, and its principal place of business and headquarters is located in Calabasas, California. CHL is, and at all relevant times was, the focal point of COUNTRYWIDE's home mortgage activities and directed and controlled those activities, including by controlling the contents of the loan documents at issue here, from its Calabasas headquarters. At all relevant times hereto, Defendants were and are engaged in the business of originating and selling the Option ARM loans that are the subject of this Complaint. Defendants transact business in Alameda County, California and at all relevant times sold

1  Option ARM loans throughout the United States, including Alameda County, California. Defendants

2  have significant contacts with Alameda County, California, and the activities complained of herein

3  occurred, in whole or in part, in Alameda County, California.

4        6.     From its headquarters and principal place of business in Calabasas, California,

5  COUNTRYWIDE created, approved, disseminated, and sold the Option ARM loans that are the subject

6  of this complaint. COUNTRYWIDE sold a significant number of the subject Option ARM loans to

7  California residents. Plaintiffs are informed and believe and thereon allege that Defendants' employees

8  and/or agents responsible for the creation, approval and sale of the subject Option ARM loans are

9  located in California, and/or the decisions concerning approval of the loan forms and/or approval of the

10  Plaintiffs and the Class members loans where authorized and/or approved by Defendants' corporate

11  officers, executives and employees located in California.

12        7.     Plaintiff is further informed, believes, and thereon alleges that:

13            (a)     CHL is, and/or was, in the business of, among other things, securitizing home

14                  mortgage loans by packaging those loans into trusts or other vehicles so that it

15                  could sell bonds to investors based on the income to be derived from those loans.

16                  CHL is a critical and necessary participant in that securitization process;

17            (b)     CHL agreed to purchase and did purchase numerous Option ARM mortgages

18                  originated by the other Defendants. Through that arrangement, the other

19                  Defendants collected fees from the homeowners to whom it sold the Option ARM

20                  loans as well as from CHL, while CHL collected revenues through the

21                  securitization process; and

22            (c)     CHL's agreement to purchase the Option ARM loans sold by the other

23                  Defendants was critical to the other Defendants' ability to sell those loans to

24                  Plaintiffs and other homeowners, since the other Defendants lacked the financial

25                  resources to continue to issue the Option ARM loans at issue unless it was able to

26                  sell them to investors such as CHL.

27        8.     Defendant CHL, at all material times in this Complaint, was qualified to do business in

28  California. At all times relevant to this action, the chief executive officer of CHL was Angelo Mozilo

---

3

FIRST AMENDED CLASS ACTION COMPLAINT

1   ("Mozilo"), the chief operating officer and president was David Sambol ("Sambol"), and the chief

2   financial officer was Eric Sieracki ("Sieracki"), and at all times relevant hereto, Mozilo, Sambol, and

3   Sieracki were acting within the scope and course of their employment by COUNTRYWIDE.

4        9.     At all times mentioned herein, Defendants were engaged in the business of originating,

5   selling, servicing, and/or owning, and/or are or were the assignees of the Option ARM loans that are the

6   subject of this Complaint, throughout the State of California, including in Alameda County, California.

7       10.     Plaintiffs are informed, believe, and thereon allege, that each of the aforementioned

8   Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit,

9   fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the

10   occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by

11   the conduct of Defendants.

12       11.     Plaintiffs are informed, believe, and thereon allege, that at all times material hereto and

13   mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint venturer,

14   partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants

15   and was at all times acting within the purpose and scope of such agency, servitude, joint venture,

16   division, ownership, subsidiary, alias, assignment, alter-ego, partnership or employment and with the

17   authority, consent, approval and ratification of each remaining Defendant.

18       12.     Plaintiffs are informed, believe, and thereon allege, that at all times herein mentioned,

19   each Defendant was acting in concert or participation with each other, or were joint participants and

20   collaborators in the acts complained of, and was the agent or employee of the others in doing the acts

21   complained of herein, each and all of them acting within the course and scope of said agency and/or

22   employment by the others, each and all of them acting in concert one with the other and all together.

23   Each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each

24   of the other Defendants and was acting within the course and scope of said conspiracy, agency,

25   employment, assignment and/or joint venture and with the permission and consent of each of the other

26   Defendants.

27       13.     Plaintiffs are informed, believe, and thereon allege, that DOES 1 through 200, inclusive,

28   are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO

1 │ trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are

2 │ assignees to the loans which are the subject of this action. Plaintiffs will seek leave of Court to replace

3 │ the fictitious names of these entities with their true names when they are discovered.

4 │     14.    The true names and capacities, whether individual, corporate, associate or otherwise, of

5 │ Defendants DOES 1 through 200, inclusive, and each of them, are unknown to Plaintiffs at this time,

6 │ and Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs allege, on information

7 │ and belief, that each Doe defendant is responsible for the actions herein alleged. Plaintiffs will seek

8 │ leave of Court to amend this Complaint when the names of said DOE defendants have been ascertained.

9 │

10 │ **III.**

11 │ **JURISDICTION AND VENUE**

12 │     15.    This Court has jurisdiction over this matter pursuant to the California Constitution,

13 │ Article XI, Section 10 and California Code of Civil Procedure ("CCP") §41 0.1 0 because

14 │ Defendants transacted business and committed the acts complained of herein in California. The

15 │ allegations are sufficient to sustain the causes of action without resort to federal law. More than

16 │ two-thirds of the Class Members are from California, own property in California which is or was

17 │ financed and/or secured by the Option ARM loans at issue, all Defendants are located in California, and

18 │ COUNTRYWIDE has its principal place of business in and is headquartered in California; thus, this

19 │ case is not subject to removal under the Class Action Fairness Act of 2005 under both the "home state

20 │ exception" and the "local controversy exception." 28 U.S.C. §1332(d)(4)(A) (home state exception); 28

21 │ U.S.C. §1332 (d)(4)(B) (local controversy exception).

22 │     16.    Venue is proper in Alameda County, California pursuant to CCP §395 and

23 │ because many of the acts complained about occurred in Alameda County and Plaintiffs and Class

24 │ Members reside in Alameda County.

25 │ ///

26 │ ///

27 │ ///

28 │ ///

IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

17.     The Option ARM loans that are the subject of this Complaint are the loans sold by Defendants with the following common characteristics: (i) the Monthly Payment Amount stated in the Note is based upon a low "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule listed in the Truth-In-Lending Disclosure Statements ("TILDS"), for the first 2-5 years of the Note, is based upon a fully amortizing payment at the "teaser" interest rate; (iii) in fact, the interest rate "adjusts" after only one month to a much higher rate that is the sum of the "index" and the "margin"; and (iv) after the first 2-5 years, the amount of monthly payments balloons to a much greater amount.

18.     At all times material hereto, the index plus margin was never low enough to be close to the "teaser" rate, so that, after only one month, the interest accruing on the Note more than doubled from an amount that was usually below 2% to an amount of at least 4%, and normally closer to 8%. Indeed, the average interest rate on these loans was approximately 7.87%, fully 2 percentage points higher than the prevailing rate on COUNTRYWIDE's fixed rate loans.  Because of this dramatic interest rate adjustment after only one month, the monthly payment, which was calculated based on a fully amortizing payment at the low teaser rate, was no longer sufficient to even pay the interest that accrued on the Note, and the balance owed increases even if the payments are made as scheduled on the Note and the TILDS. This process is known as negative amortization, and Defendants knew it was certain to occur because of the large spread between the teaser rate and the combined index and margin.

19.     Because of the way COUNTRYWIDE structured these Option ARM loans, it was certain that, as payments were made each month for the first 2-5 years of the loan, each Class Member would owe more money than he or she did at the start of the loan, and have less time to pay it back.  To make matters worse, this "deferred interest" was added to the principal balance and, in turn, accrued more interest – in effect using compound interest to increase the balance owed by each borrower.

20.     These undisclosed facts were known to COUNTRYWIDE.  In its 10K for the year ending December 31, 2006, COUNTRYWIDE clearly and concisely reported to its investors that the loans at issue here would cause negative amortization and that the existence of that negative amortization feature would ultimately create problems for borrowers.  COUNTRYWIDE reported: "These loans are different

than 'traditional' loans in that they may allow paying less than full interest payments (thereby increasing the loan balance) in the early periods of a loan's life." It also reported its methods for protecting its own bottom line from the increased risk of borrower default that negative amortization created, including insuring that the loans it issued could be sold into the secondary market and off its own balance sheets as quickly as possible. Indeed, COUNTRYWIDE sold nearly all of the mortgage loans that it produced in the secondary market, primarily in the form of mortgage backed securities.

21. The fact that negative amortization is certain to occur on the subject loans was information that Plaintiffs and Class Members would have found material when deciding whether to purchase the subject COUNTRYWIDE Option ARM loan. Despite this, COUNTRYWIDE never disclosed to Plaintiffs and Class Members this material information. Had Defendants disclosed this material information, Plaintiffs and Class Members would not have purchased the loan products.

22. As reasonable consumers, Plaintiffs and Class members would find information regarding the interest rate on the loan and the amount of the monthly payments material, including, without limitation, the fact that negative amortization was certain to occur if the monthly payment schedule, given to Plaintiffs and the Class Members prior to entering into the loans, was followed. The subject COUNTRYWIDE Loan Documents failed to disclose this material information to borrowers before they entered into the loans. Moreover, the Loan Documents presented to borrowers at the time of closing, contained partially true statements but failed to provide all of the true facts, and thus, the COUNTRYWIDE Loan Documents were false and/or misleading. For instance, Defendants disclosed a teaser interest rate, but they did not disclose that this rate would sharply increase after only one month. Defendants disclosed a low monthly payment for the first 2-5 years of the loan, which was based on the teaser rate, but this did not reflect the actual amount of interest being charged or the amount Plaintiffs and Class Members actually owed each month to prevent negative amortization.

23. Before they entered into the subject COUNTRYWIDE Option ARM Loan, Plaintiffs and Class Members were not informed of the sharp increase in the interest rate, and the fact that their monthly payments were not enough to pay the interest accruing on the loan, until they had made at least several payments following the closing of the loan, at which time they would receive a statement showing that the principal balance had increased since Defendants had increased the interest rate from

1  the teaser rate, despite the fact that the borrower had made all payments as scheduled.

2      24.    By the time Plaintiffs and Class Members realized that the Option ARM loans at issue

3  were certain to cause negative amortization to occur for the first 2-5 years of the loan, they were

4  "locked" into the loan by a draconian prepayment penalty consisting of a prepayment charge equal to

5  the interest that would accrue during a six-month period of the amount prepaid (if the prepayment

6  amount was greater than 20% of the original principal amount stated in the Note), which was calculated

7  at the rate of interest in effect under the terms of the Note at the time of the prepayment for a

8  prepayment occurring during the first two to three years of the loan. *See* "Prepayment Penalty

9  Addendum", Exhibits 1-3, attached hereto. This draconian provision was designed by

10  COUNTRYWIDE to deter anyone from refinancing the loan during the applicable time period.

11      25.    Before Plaintiffs and Class Members entered into the subject COUNTRYWIDE Option

12  ARM loan, Defendants failed to disclose and concealed the amount by which their loan balances would

13  increase over the first two to three years of the loan, even though Defendants had actually performed

14  this calculation internally. This increase in the loan balance was material information to any consumer

15  entering into these loans, because it effectively strips them of the equity in their homes, while also

16  greatly impairing their ability to refinance these loans once they recast to substantially higher monthly

17  payments.

18      26.    The loans were structured so that once Plaintiffs and Class Members were able to

19  discover that their loans were negatively amortizing, they could get out of the loans only by incurring a

20  substantial prepayment penalty, or waiting two to three years, in which case they would have to

21  refinance a substantially larger principal amount.

22      27.    Each subject Option ARM loan has so-called payment caps, which provide that, even

23  after the monthly payment increases, it will not increase by more than 7.5% per year. *See* Exhibits 1-3,

24  ¶ 3(D). These payment caps are, however, subject to an overall cap on principal of 115% of the original

25  loan amount. *See* Exhibits 1-3, ¶ 3(F). Once the loan principal reaches this 115% cap, the 7.5%

26  limitation on payment increases no longer applies, and the payment generally will increase by far more

27  than this amount. The existence of this built-in "payment shock" was material information that

28  Plaintiffs and Class Members would have found to be material in deciding whether to purchase the

1   loans, and how much to finance, as this "payment shock" is more than many Class Members could
2   afford to pay.

3       28.    However, the most that Defendants' loan documents said about negative amortization
4   was that it "may" occur. This was misleading and deceptive, because it implies that negative
5   amortization was subject to some future contingency, such as an increase in the index on which the
6   adjustable rate was purportedly based, when, in fact, it was *guaranteed* to occur after only one month,
7   even if the index stayed the same or went down.

8       29.    The failure of Defendants to disclose this material information in the loan documents
9   violated California consumer protection statutes, and common law, as more fully set forth below.

10      30.    Defendants' sharp increase in the interest rate after only one month, which guaranteed
11  negative amortization, also violated the terms of Defendants' own contract with Plaintiffs and Class
12  Members, and also breached the covenant of good faith and fair dealing.

13      31.    The loan characteristics described above were true of the named Plaintiffs' loans. These
14  were also the common characteristics of the standardized Loan Documents used by Defendants during
15  the liability period. It is these Loan Documents that are the subject of this Complaint.

16      32.    From 2005 through 2007, Mozilo, along with Sambol, and Sieracki, held
17  COUNTRYWIDE out as primarily a maker of prime quality mortgage loans, qualitatively different from
18  competitors who engaged primarily in riskier lending. To support this false characterization, Mozilo,
19  Sieracki, and Sambol hid from consumers that COUNTRYWIDE, in an effort to increase market share,
20  engaged in an unprecedented expansion of its underwriting guidelines from 2005 and into 2007.
21  Specifically, Countrywide developed what was referred to as a "supermarket" strategy, where it
22  attempted to offer any product that was offered by any competitor. By the end of 2006,
23  COUNTRYWIDE's underwriting guidelines were as wide as they had ever been, and COUNTRYWIDE
24  was writing riskier and riskier loans.  Even these expansive underwriting guidelines were not sufficient
25  to support COUNTRYWIDE's desired growth, so COUNTRYWIDE wrote an increasing number of
26  loans as "exceptions" that failed to meet its already wide underwriting guidelines even though exception
27  loans had a higher rate of default.

28      33.    COUNTRYWIDE originated, sold, and serviced both prime and subprime (which

COUNTRYWIDE's periodic filings referred to as "nonprime") mortgage loans. By 2005,
COUNTRYWIDE was the largest U.S. mortgage lender in the United States, originating over $490
billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.
COUNTRYWIDE recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production
divisions in 2005 and 2006, respectively, and a pre-tax loss of $1.5 billion in its loan production division
in 2007.

34.    COUNTRYWIDE pooled most of the loans it originated and sold them in secondary
mortgage market transactions. COUNTRYWIDEsold the pooled loans either through whole loan sales
or securitization. In whole loan sales, COUNTRYWIDE sold the loans to investors and recorded gains
on the sales. In securitizations, COUNTRYWIDE sold interests in the pooled loans, i.e.,
mortgage-backed securities. COUNTRYWIDE's loan sales were run out of its capital markets division.
In 2005, COUNTRYWIDE reported $451.6 million in pre-tax earnings from capital market sales,
represnenting 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax earnings
from that division, representing 12.8% of its pre-tax earnings, and in 2007 it recognized a mere $14.9
million in pre-tax earnings from that division ,reporting a pre-tax loss overall.

35.    In 2005 and 2006, COUNTRYWIDE's Option ARMs ranged between 17% and 21% of
its total loan originations. It maintained the majority of these loans for investment portfolio with another
unit or division.

36.    By the end of 2006, COUNTRYWIDE's underwriting guidelines were wider and more
aggressive than they had ever been. The company's aggressive guideline expansion was deliberate, and
began as early as 2003. Indeed, from January 2003 until well into 2006, COUNTRYWIDE's credit risk
management department ("Risk Management") spent approximately 90% of its time processing requests
for expansions of COUNTRYWIDE's underwriting guidelines.

37.    COUNTRYWIDE's "matching strategy," also known as the "supermarket strategy," was
a key driver of the company's aggressive expansion of underwriting guidelines. The strategy committed
the company to offering any product and/or underwriting guideline available from at least one
"competitor," which included sub-prime lenders. Thus, if COUNTRYWIDE did not offer a product
offered by a competitor, COUNTRYWIDE's production division invoked the matching strategy to add

the product to COUNTRYWIDE's menu. For example, if COUNTRYWIDE's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at COUNTRYWIDE to 560. The impact of the matching strategy was intensified by COUNTRYWIDE's "no-brokering" policy, which precluded COUNTRYWIDE's loan officers from referring loan applicants to other brokers and/or institutions. Prior to its implementation, loan officers could engage in a practice known as "brokering," in which the loan officer would refer those borrowers deemed too risky for COUNTRYWIDE to another lender, which in turn paid a commission to the COUNTRYWIDE loan officer. The no-brokering policy increased the incentives for COUNTRYWIDE's retail sales force to be aggressive in finding ways for COUNTRYWIDE to underwrite a loan, regardless of whether the loan satisfied the underwriting guidelines COUNTRYWIDE repeatedly touted to investors.

38.     Mozilo, Sambol, and Sieracki knew that the company was taking on increased risk of defaults and delinquencies as a result of its widened underwriting guidelines and matching strategy, yet COUNTRYWIDE concealed the unprecedented expansion of underwriting guidelines and the attendant increased credit risk from borrowers.

39.     The risk for borrowers entering into Option ARM loans with COUNTRYWIDE was foreseen by COUNTRYWIDE at least as early as September 2004. Risk Management warned COUNTRYWIDE's senior officers that several aggressive features of Countrywide's guidelines (e.g., high loan to value programs and ARM loans) significantly increased COUNTRYWIDE's credit risk, because borrowers would be unable to repay the Option ARM loans at issue.

40.     In one internal email, Mozilo referred to a particularly profitable sub-prime product as "toxic," and in another he stated that the company was "flying blind," and had "no way" to predict the performance of its heralded product, the Option ARM loan. Mozilo believed that the risk was so high and that the secondary market had so mispriced Option ARM loans that he repeatedly urged that COUNTRYWIDE sell its entire portfolio of those loans. Mozilo urged this because he knew that Option ARM borrowers, including Plaintiff and the Class Members would likely be unable to make monthly payments on their loans once they reset to include all of the additional principal created by negative amortization and to finally reflect the interest rates Countrywide was actually applying to the

1   loans.

2       41.     COUNTRYWIDE began originating Option ARM loans in 2004; by the second quarter

3   of 2005, 21% of COUNTRYWIDE's loan production were Option ARM loans. Because Countrywide

4   began to offer Pay-Option loans in 2004, COUNTRYWIDE's first wave of automatic resets due to

5   recasting were scheduled to occur in 2009.

6       42.     COUNTRYWIDE publicly heralded Option ARM loans as a safe product offering. On

7   May 31, 2006, Mozilo gave a speech in which he stated, "Pay-Option [ARM] loans represent the best

8   whole loan type available for portfolio investment from an overall risk and return perspective," that,

9   "[t]he performance profile of this product is well understood because of its twenty year history, which

10  includes stress tests in difficult environments[,]" and that COUNTRYWIDE "actively manages credit

11  risk through prudent program guidelines...and sound underwriting."

12      43.     Contrary to such public statements extolling the virtues of the Option ARM loan product,

13  Mozilo, along with several of Countrywide's senior executives, had concluded that the product's risks to

14  the company were severe because the negative amortization feature caused a greater risk of borrower

15  default:

16      • On or about April 4, 2006, Mozilo sent an email to Sambol stating that "Since over 70% [of

17      Option ARM borrowers] have opted to make the lower payment it appears that it is just a matter

18      of time that we will be faced with much higher resets and therefore much higher delinquencies.

19      • On or about May 18, 2006, Mozilo sent another email to Sambol stating that "the Bank faces

20      potential unexpected losses because higher [interest] rates will cause the loans to reset much

21      earlier than anticipated and as a result causing mortgagors to default due to the substantial

22      increase in their payments."

23      • On July 10, 2006, upon learning that the percentage of Option ARM borrowers paying the

24      minimum amount had nearly doubled from 37% to 71%, Mozilo requested that the company

25      start informing new Option ARM borrowers of the dangers of negative amortization and

26      encouraging full payment.

27  They were thus scrambling to identify ways to mitigate these risks. Sambo and Sieracki were aware of

28  these concerns.

44.   In June 2005, COUNTRYWIDE Risk Management warned senior executives, including Sieracki, that action was needed to address the increasing pace of negative amortization and the potential for payment shock associated with Pay-Option ARMs. Specifically, in a June 28, 2005 meeting of the credit risk committee, which was attended by Sieracki, Risk Management recommended that the rate used to calculate the minimum payment on Option ARMs loans be raised to reduce negative amortization and the severity of payment shock. Risk Management explained that while the "teaser" rate remained constant at 1%, short term rates (upon which borrowers' fully amortizing payments were based) had  risen steadily, thereby increasing the pace of negative amortization and the severity of the resulting payment shock.

45.   Mozilo received more dire news regarding the Option ARM loan portfolio in June 2006. On June 1, 2006, one day after he gave a speech publicly praising Option ARM loans, Mozilo sent an email to Sambol and other executives, in which he expressed concern that the majority of the Option ARM loans were originated based upon stated income, and that there was evidence that the stated incomes were not correct.  Mozilo viewed stated income as a factor that increased credit risk and the risk of default. In his email, Mozilo reiterated his concern that in an environment of rising interest rates, resets were going to occur much sooner than scheduled, and because at least 20% of the Option ARM borrowers had FICO scores less than 700, borrowers *are going to experience a payment shock which is going to be difficult if not impossible for them to manage.*" Mozilo concluded that the company needed to act quickly to address  these issues because "*[w]e know or can reliably predict what's going to happen in the next couple of years.*" (Emphasis added.)

46.   On July 10, 2006, Mozilo received an internal monthly report, called a "flash report," that tracked the delinquencies in the Option ARM loan portfolio, as well as the percentage of borrowers electing to make the minimum payment and the amount of accumulated negative amortization on each loan. *Mozilo learned that from September 2005 through June 2006, the percentage of Option ARM loan borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71 %.* (Emphasis added.)

47.   About a month later, on August 16, 2006, Mozilo received an e-mail from a fellow member  of COUNTRYWIDE's board of directors, asking whether the company anticipated any

significant problems with the Option ARM loan portfolio.  Mozilo responded by reiterating the ongoing

concerns he had shared with senior management earlier in 2006.  *By this point in time, over 75% of the*

*Option ARM borrowers were opting for the minimum payment, which, along with rising interest*

*rates, continued to accelerate negative amortization.  Mozilo explained that, as a result, the loans*

*would reset much faster than the borrowers expected with accompanying payment shock.  The only*

*solution, Mozilo wrote, was to refinance the loans before reset, but this would be difficult in light of*

*decreasing home values, rising interest rates, and the draconian pre-payment penalties attached to*

*the loans for the first 2-3 years*.  Mozilo wrote that only "unlikely" events, such as a dramatic rise in

home values or a dramatic drop in interest rates, would alleviate future payment shock.

48.     Mozilo met with Sambol the morning of September 25, 2006 to discuss the Option ARM

loan portfolio. The next day Mozilo sent an e-mail to Sambol and Sieracki expressing even greater

concern about the portfolio. In that e-mail, Mozilo wrote:

> **[w]e have no way, with any reasonable certainty, to assess the real**
>
> **risk of holding these loans on our balance sheet. The only history we**
>
> **can look to is that of World Savings however their portfolio was**
>
> **fundamentally different than ours in that their focus was equity and**
>
> **our focus is fico. In my judgement, as a long time lender, I would**
>
> **always trade off fico for equity. The bottom line is that we are flying**
>
> **blind on how these loans will perform in a stressed environment of**
>
> **higher unemployment, reduced values and slowing home sales.**
>
> (Emphasis added).

49.     Mozilo never became comfortable with the risk presented by the Option ARM loan

products. On November 3, 2007, Mozilo instructed other executives that he did not "want any more Pay

Options originated for [COUNTRYWIDE]. *I also question whether we should touch this product*

*going forward because of our inability to properly underwrite these combined with the fact that these*

*loans are inherently unsound.*" (Emphasis added).  Finally, on November 4, 2007, Mozilo advised

other executives that "options [ARMs] have hurt the company and the Bank badly.... World Savings

culture permits them to make these loans in a sound manner and our culture does not .... fico scores are

1   no indication of how these loans will perform."

2       50.     When he described Option ARM loans as "inherently unsound," Mozilo was referring to

3   the fundamental truth, not disclosed to borrowers, but known to Countrywide, that the loans here at

4   issue are inherently fraudulent and unfair, as they lure borrowers in based upon the promise of

5   extremely low interest and low payments, but are in fact designed to feature high interest rates and, later,

6   extremely high payments (much higher than would be required under traditional mortgage loans).

7       51.     Despite the repeated warnings of Mozilo and other executives, the clearly identified risks

8   of Option ARM loans were not disclosed to consumers or borrowers.  Mozilo recognized as early as

9   August 2006 that Option ARM loans were one of the *"only products left with margins [profit]."*

10

11                                          **V.**

12                          **CLASS ACTION ALLEGATIONS**

13      52.     Plaintiffs bring this action on behalf of themselves, on behalf of all others similarly

14  situated, and on behalf of the General Public.  The Class Plaintiffs seek to represent is defined as

15  follows:

16              All California residents who, from May 27, 2003 through the date that

17              notice is mailed to the Class members, entered into a COUNTRYWIDE

18              Option ARM loan on their home located in the State of California.

19              Excluded from the California Class are Defendant's employees, officers,

20              directors, agents, representatives, and their family members, as well as the

21              Court and its officers, employees, and relatives.

22      Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court

23  at the appropriate time, or to propose or eliminate sub-Classes in response to facts learned through

24  discovery or legal arguments advanced by Defendants or otherwise.

25      53.     This action has been brought and may be properly maintained as a class action pursuant

26  to the provisions of California Code of Civil Procedure § 382 and other applicable law.

27      54.     **Numerosity**: - Code of Civ. Proc. § 382: Members of the Class are so numerous that

28  their individual joinder is impracticable.  While the exact number of class members is unknown at this

1     time, Plaintiffs are informed and believe that the entire Class consist of approximately tens of thousands

2     of individuals residing in California.   Also, while the precise number of Class members and their

3     addresses are unknown to Plaintiffs, however Plaintiffs are informed and believe that the number can be

4     obtained from the Defendants' records.  Class members may be notified of the pendency of this action

5     by electronic mail, the Internet, other mail, or published notice.

6        55.  **Commonality**: - Code of Civ. Proc. § 382:  Common questions of law or fact are shared

7     by class members.  This action is suitable for class treatment, because these common questions of fact

8     and law predominate over any individual issues.  Such common questions include, but are not limited to,

9     the following questions including questions related to the subject COUNTRYWIDE Option ARM loans:

10          (a)     Whether Defendants engaged in unlawful, unfair and/or fraudulent business acts

11                 or practices likely to deceive Plaintiffs and Class Members before and during the

12                 loan application process;

13          (b)     Whether Defendants concealed, omitted and/or otherwise failed to disclose

14                 information they were mandated to disclose under state consumer protection

15                 statutes, and/or California common law;

16          (c)     Whether Defendants failed to disclose to Plaintiffs and Class Members, before

17                 they entered into the subject Option ARM loans, that negative amortization was

18                 certain to occur;

19          (d)     Whether Defendants had a duty to disclose the undisclosed material facts

20                 regarding the subject Option ARM loans

21          (e)     Whether Defendants' failure to apply Plaintiffs' and Class Members' payments to

22                 principal as promised in the form Notes constitutes a breach of contract, including

23                 a tortious breach of the covenant of good faith and fair dealing;

24          (f)     Whether Defendants' conduct in immediately raising the interest rate on the loans

25                 so that no payments were made to the principal balance breached the loan

26                 contract and/or constitutes a contractual or tortious breach of the covenant of

27                 good faith and fair dealing;

28          (g)     Whether the terms and conditions of the Loan Documents are unconscionable;

(h)    Whether the Loan Documents are non-negotiable instruments;

(i)    Whether Plaintiffs and Class Members are entitled to damages;

(j)    Whether Plaintiffs and Class Members are entitled to punitive damages; and

(k)    Whether Defendants' affirmative defenses, if any, raise common issues of fact or law as to Plaintiff and Class Members as a whole.

56.    **Typicality**:  Plaintiffs' claims are typical of the claims of absent Class Members. Plaintiffs and the other Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and the other Class Members are based on the same legal theories.

57.    **Adequacy**:  Plaintiffs are adequate representatives of the Class because their interests do not conflict with those of the other members of the Class Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend on prosecuting this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

58.    **Ascertainable Class**:  The proposed classes are ascertainable in that the members can be identified and located using information contained in Defendants' mortgage lending records.

59.    **Superiority and Substantial Benefit**:  A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' and the Class members' claims. The damages suffered by each individual Class member may be limited.  Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  Further, it would be virtually impossible for the Class members to redress the wrongs done to them on an individual basis.  Even if members of the Class themselves could afford such individual litigation, the court system could not.  Individualized litigation increases the delay and expense to all parties and the court system, due to the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

60.    In the alternative, the Class should be certified because:

(a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members which

1  would establish incompatible standards of conduct for Defendants;

2        (b)    The prosecution of separate actions by individual members of the Class would

3  create a risk of adjudications with respect to them, which would, as a practical matter, be dispositive of

4  the interests of the other Class members not parties to the adjudications, or substantially impair or

5  impede their ability to protect their interests; and

6        (c)    Defendants have acted or refused to act on grounds generally applicable to the

7  Class, and/or the General Public, thereby making appropriate final and injunctive relief with respect to

8  the Class as a whole.

9

10                    **VI.**

11              **FIRST CAUSE OF ACTION**

12                 **Fraudulent Omissions**

13               **(Against All Defendants)**

14    61.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

15    62.    Under California common law, COUNTRYWIDE had a duty to disclose to Plaintiffs, and

16  each Class Member that: (i) the promised low teaser interest rate was only available for thirty days if at

17  all; (ii) the payment amount for the first two to five years provided to Plaintiffs and Class Members on

18  the TILDS was insufficient to pay both principal and interest; (iii) negative amortization was absolutely

19  certain to occur if Plaintiffs and Class Members made payments according to the payment schedule

20  provided by Defendants; and that (iv) loss of equity and/or loss of Plaintiffs' and Class Members'

21  residence was certain to occur if Plaintiffs and Class Members made payments according to the payment

22  schedule provided by Defendants. These facts constitute material information that Plaintiffs and Class

23  Members would have found material when deciding whether to purchase the loan product. Had

24  Defendants disclosed this information, Plaintiff and Class Members would not have entered into the

25  subject COUNTRYWIDE Option ARM Loan on these terms.

26    At all relevant times, Defendants actively concealed these material facts from Plaintiffs and

27  Class Members. At all relevant times, Defendants had superior, if not exclusive, knowledge of the

28  concealed facts. Where Defendants did make disclosures, they made partial representations while

18

1  suppressing materials facts, as demonstrated herein.

2      63.    In each of the Loan Documents at issue, Defendants actively concealed and failed to

3  disclose to the borrower that each payment in years 1-3, is insufficient to pay all of the interest, let

4  alone, any of the principal. The Loan Documents state under "BORROWERS FAILURE TO PAY AS

5  REQUIRED," that "[t]he amount of the charge will be 5.0000% [or other similar percentage] of *my*

6  *overdue payment of Principal and Interest*" (emphasis added). *See* Exhibits 1-3, ¶ 7(A).  These partial

7  representations failed to disclose that the monthly payment amounts prescribed in the TILDS and also

8  stated in the Note (at paragraph 3(B) of Exhibits 1-3 of the attached Plaintiffs' Loan Documents and

9  similarly for each Class Member) were certain to result in negative amortization.

10     64.    The Loan Documents further state that, at ¶3E "my monthly payment *could be less* than

11  the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid

12  principal" (emphasis added) (*see* Exhibits 1-3, ¶3E) . However, the Loan Documents fail to disclose the

13  material fact that the payment schedules provided by Defendants in the TILDS could not possibly cover

14  the amount of interest due under *any* conceivable index rate plus the margin after the first 30 days.

15     65.    The Notes list an interest rate and a payment amount based on the initial teaser interest

16  rate.  However, the TILDS Defendants gave to Plaintiffs and Class Members before they entered into

17  the subject loans included a schedule of payments (including that initial payment amount) but disclose a

18  different, much higher interest rate. By stating the low teaser rate and associated monthly payment in

19  the Note, and stating the much higher interest rate in the TILDS accompanied by a payment schedule

20  based on the low teaser rate, Defendants failed to disclose the actual interest costs that borrowers were

21  going to accrue on their loans.

22     66.    Defendants purposefully and intentionally devised this Option ARM loan scheme of

23  stating only partially true facts and omitting important material information in order to deceive

24  consumers into believing that these loans would provide a low-interest rate for the first two to five years

25  of the Note and that, if they made their payments according to the payment schedule provided by

26  Defendants, this would be sufficient to pay both principal and interest.

27     67.    Defendants also actively concealed and failed to disclose information regarding the

28  payment caps associated with the loans, *and during the entire time the payment caps were in effect,*

*negative amortization was certain to occur if the payment schedule provided prior to entering into the loans was followed.* Defendants knew or should have known that this loan product had a variable rate with payment caps and that the Loan Documents omitted the Material Omissions, including that negative amortization was a certainty. Defendants also knew or should have known that the loans were guaranteed to result in negative amortization, because Defendants and COUNTRYWIDE accrued the negative amortization as income for accounting and/or tax purposes. COUNTRYWIDE was also aware the negative amortization was certain to occur, because, in computing the total finance charge payable over the full life of the loan for purposes of compiling the TILDS, Defendants included the interest on "deferred interest," which would accrue because the scheduled payments were insufficient to pay all interest due on the loan. The loan documents did not disclose the fact that negative amortization was a certainty, or the amount of the total finance charge that resulted from this negative amortization.

68.     The only places in the Notes that even inferentially reference negative amortization suggest that negative amortization was merely a possibility, rather than an absolute certainty. For instance, Defendants stated in the Notes, at ¶ 3(E), that the borrower's "monthly payments could be less than or greater than" necessary to cover all of the interest due on the Notes, which was a half-truth, and intended to conceal the whole truth, because it did not state that the payment schedule provided by Defendants would absolutely guarantee that negative amortization was going to occur on these loans.

69.     The Loan Documents of Defendants were deceptive and misleading, in that the payments for up to the first five years of the loans bear no relationship to the APR listed in the TILDS.

70.     At all times relevant during the liability period, the Loan Documents were misleading, omitted and concealed material information, and were unlawful, in that the Notes and TILDS did not disclose that the liability that Plaintiffs and Class Members were incurring was substantially greater than the amount of their scheduled payments.

71.     Defendants failed to disclose to Plaintiffs and Class Members that the initial interest rate was discounted, and that it was absolutely certain to substantially increase after only one month, even when the index did not rise. To the extent that Defendants did in any way provide a disclosure stating that the initial payment was not based on the index, they failed to do so in a manner that was clear and conspicuous, and that did not obscure its importance, or that was designed to be reasonably understood

1   by the ordinary consumer. Rather than disclose that the interest rate would increase after only one

2   month, the Loan Documents stated that the initial payment was based on a "yearly rate" of 1-3%.

3         72.    Defendants also failed to disclose to Plaintiffs and Class Members before they entered

4   into the subject Option ARM loans all of the ways by which the interest rate applicable to the subject

5   loans could increase.

6         73.    At all times relevant during the liability period, Defendants provided Plaintiffs and Class

7   Members with Notes that state: "I will pay interest at a yearly rate of [1.000% - 3.000%]." *See*

8   Exhibits 1-3, ¶2(A).  However, in the TILDS, the box entitled "ANNUAL PERCENTAGE RATE"

9   describes the APR as "[t]he cost of your credit as a yearly rate" and then lists a much higher APR than

10   the rate listed in the Notes.  For instance, in the case of Plaintiff DOROTHY PERALTA, the TILDS

11   listed an APR of "7.622." *See* Exhibit 1, TILDS.  For Plaintiff STEVEN BIGVERDI, the TILDS listed

12   an APR of "5.321." *See* Exhibit 2, TILDS.  For Plaintiff JAMES MOSCOSO, the TILDS listed an APR

13   of "6.145." *See* Exhibit 3, TILDS.

14         74.    Thus, the listed APR would actually conflict with the rate stated in the Notes.  For

15   instance, in the case of Plaintiff DOROTHY PERALTA the "2.000%" stated in the Note contradicts the

16   "7.622" APR that COUNTRYWIDE stated in the TILDS, and in the case of Plaintiff STEVEN

17   BIGVERDI, the "1.000%" stated in the Note contradicts the "5.321" APR that COUNTRYWIDE stated

18   in the TILDS.  And for Plaintiff JAMES MOSCOSO, the "1.000%" stated in the Note contradicts the

19   "6.145%" APR that COUNTRYWIDE stated in the TILDS.

20         75.    At all times relevant during the liability period, Defendants failed to clearly and

21   conspicuously explain in the Note or TILDS that the low rate (the same rate upon which Defendant

22   based the written payment schedule provided to Plaintiffs) was offered only for the first thirty (30) days

23   of the loan.

24         76.    Defendants also concealed and failed to disclose to Plaintiffs and Class Members that the

25   APR listed in the TILDS was not the APR used to determine the first five years of payments listed in the

26   very same TILDS, and that the listed payment amounts for the first five years of the loan were based on

27   the interest rate stated in the Note, an interest rate which was correct for no more than thirty days.

28         77.    The disclosures are required because they are material, and indeed, form the core basis

1  for Plaintiffs and Class Members to make an informed decision by comparing the cost of credit to other

2  proposals. It therefore was incumbent upon Defendants to disclose to Plaintiffs and the Class members

3  before they entered into the subject Option ARM loans the composite interest rate, and the amount of

4  payments based thereon, so that these borrowers could understand exactly what they would be paying

5  for the loan.

6        78.     At all times relevant, COUNTRYWIDE had a duty to disclose to Plaintiffs and the Class

7  Members, before they entered into the subject Option ARM loans: (i) that the payment schedule for the

8  first two to five years was not based upon the APR listed on the TILDS; (ii) that negative amortization

9  will occur and that the "principal balance will increase"; (iii) that the initial interest rate on the Note was

10  discounted; and (iv) the applicable annual percentage rate ("APR").

11        79.     The omitted information, as alleged herein, was objectively material to both the interest

12  rate and the amount of payments, which are the two most important features of any mortgage loan.

13  Moreover, as Countrywide's own internal communications demonstrate, the omitted information about

14  the certainty of negative amortization also was material because it related directly to the likelihood that

15  the borrower would default on the loan.

16        80.     As a direct and proximate result of Defendant's failures to disclose and omission of

17  material facts, as alleged herein, Plaintiffs and Class Members have suffered damages, which include,

18  but are not limited to, the loss of equity in their homes, which Plaintiffs and each Class Member had in

19  their homes prior to entering these loans.

20        81.     The wrongful conduct of Defendant, as alleged herein, including Defendants' placing of

21  their corporate and/or individual profits over the rights of others , was willful, oppressive, immoral,

22  unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being

23  of Plaintiffs and Class Members, and particularly vile, base, contemptible, and wretched. Such acts

24  and/or omissions were performed on the part of officers, directors, and/or managing agents of each

25  corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or

26  managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted

27  with malice and complete indifference to and/or conscious disregard for the rights and safety of others,

28  including Plaintiffs and the general public. Accordingly, Plaintiffs and Class Members are entitled to an

1    award of punitive damages against Defendants in an amount to deter them from similar conduct in the

2    future.

3         82.    WHEREFORE, Plaintiffs and Class Members are entitled to all legal and equitable

4    remedies provided by law, including but not limited to actual damages, exemplary damages,

5    prejudgment interest and costs.

6

7                                          **VII.**

8                             **SECOND CAUSE OF ACTION**

9                    **Violation of California's Unfair Competition Law,**

10                      **Bus. & Prof. Code §§ 17200 *et. seq.***

11         **"Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices**

12                            **(Against All Defendants)**

13        83.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

14        84.    Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class

15   Members, and in their capacity as private attorney generals against all Defendants for their unlawful,

16   unfair, fraudulent and/or deceptive business acts and/or practices pursuant to California Business &

17   Professions Code section 17200 *et seq.* ("UCL") which prohibits all unlawful, unfair and/or fraudulent

18   business acts and/or practices.

19        85.    Plaintiffs assert these claims as they are representatives of an aggrieved group and as

20   private attorneys general on behalf of the general public and other persons who have expended funds

21   that the Defendants should be required to pay or reimburse under the restitutionary remedy provided by

22   California Business & Professions Code §§ 17200, *et seq.*

23        86.    Plaintiffs and Class Members were consumers who applied for mortgage loans through

24   Defendants.  During the loan application process, in each case, Defendants uniformly failed to disclose

25   and omitted material information that was known only to themselves and that could not reasonably have

26   been discovered by Plaintiffs and Class Members as set forth in the preceding counts.

27        87.    Based on the Material Omissions and Defendants' other partially true statements and

28   failures to disclose as alleged herein, Plaintiffs and Class Members agreed to finance their home through

1  Defendants' Option ARM loans, and have been actually harmed.

2      88.    As a direct and proximate result of the Loan Documents they designed, Defendants

3  intended that Plaintiffs and Class Members would be misled into believing that, if they made payments

4  based on the payment schedule provided to them by Defendants before they entered into the subject

5  loans, the principal balance would not increase with each payment when in fact it actually increased

6  with each payment.

7      89.    By engaging in the above-described acts and practices, Defendants have committed one

8  or more acts of unfair competition within the meaning of Business & Professions Code §§ 17200, *et seq.*

9      90.    Defendants' misconduct, as alleged herein, gave them an unfair competitive advantage

10  over their competitors.

11      91.    <u>Unlawful</u>:  The unlawful acts and practices of Defendants alleged above constitutes

12  unlawful business acts and/or practices within the meaning of California Business & Professions Code

13  §§ 17200, *et seq.* Defendants' unlawful business acts and/or practice as alleged herein have violated

14  numerous laws and/or regulations - federal and/or state, statutory and/or common law - and said

15  predicate acts are therefore *per se* violations of §17200, *et seq.* These predicate unlawful business acts

16  and/or practices include, but are not limited to, the following: California Civil Code §§ 1572 (Actual

17  Fraud - Omissions), 1573 (Constructive Fraud by Omission), and 1710 (Deceit), and other statutory and

18  common law in effect.

19      92.    <u>Unfair</u>: Defendants' omissions and misconduct as alleged in this action constitutes

20  negligence and other tortuous conduct and this misconduct gave Defendants an unfair competitive

21  advantage over their competitors.

22      93.    Defendants' misconduct as alleged in the Material Omissions and otherwise herein

23  caused Plaintiffs and Class Members substantial injury by causing a resulting loss of equity in their

24  homes, because Defendants failed to disclose and/or omitted material information that the Option ARM

25  loans: 1) were certain to result in negative amortization if the disclosed payment schedule was followed;

26  2) had absolutely no countervailing benefit to consumers or to competition that could possibly outweigh

27  this substantial injury; and 3) caused injury that could not have been avoided or even discovered by the

28  consumers, because it resulted from Defendants' failure to disclose and/or omission of material

1 │ information that only the Defendants knew or could have known.

2 │     94.    Defendants' misconduct as alleged herein gave Defendants an unfair competitive

3 │ advantage over their competitors.

4 │     95.    Fraudulent: Through their omissions and/or acts, practices and non-disclosures as alleged

5 │ herein, Defendants designed the Loan Documents in order to deceive the public through the Material

6 │ Omissions leading to consumer confusion, including, but not limited to the fact that, for the first two to

7 │ five years, the loans were negatively amortizing loans. Said omissions, acts, practices and non-

8 │ disclosures as alleged herein therefore constitute fraudulent business acts and/or practices within the

9 │ meaning of California Business & Professions Code §§ 17200, *et seq.*

10 │     96.    Defendants' conduct, as fully described herein, was designed to and was therefore likely

11 │ to deceive members of the consuming public, and at all times, Defendants' failures to disclose and their

12 │ omission of material facts about the way their loans actually worked and the greater likelihood of default

13 │ that resulted from this have been and continue to be unfair, fraudulent, untrue and/or deceptive.

14 │     97.    The harm to Plaintiffs, members of the general public and Class Members outweighs the

15 │ utility of Defendants' policies, acts and/or practices, and consequently Defendants' conduct herein

16 │ constitutes an unlawful business act or practice within the meaning of California Business & Professions

17 │ Code §§ 17200, *et seq.*

18 │     98.    As a direct and proximate result of the aforementioned omissions, acts and practices,

19 │ Defendants received monies and continue to hold the monies expended by Plaintiffs and Class Members

20 │ similarly situated who purchased the Option ARM loans as described herein.

21 │     99.    The unfair, deceptive and/or fraudulent business practices of Defendants, as fully

22 │ described herein, present a continuing threat to members of the public to be mislead and/or deceived by

23 │ Defendants' Loan Documents at issue, as described herein. Plaintiffs and other members of the general

24 │ public have no other remedy of law that will prevent Defendants' misconduct as alleged herein from

25 │ occurring and/or reoccurring in the future.

26 │     100.    As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged

27 │ herein, Plaintiffs and Class Members have lost hundreds of thousands if not millions of dollars of equity

28 │ in their homes. Plaintiffs and Class members are direct victims of the Defendants' unlawful conduct,

1  and each has suffered injury in fact, and has lost money or property as a result of Defendants' unfair

2  competition.

3       101.    WHEREFORE, Plaintiffs and Class Members are entitled to equitable relief, including

4  restitution, restitutionary disgorgement of all profits accruing to Defendants because of the unfair,

5  fraudulent, and deceptive acts and/or practices, attorney's fees and costs, declaratory relief, and a

6  permanent injunction enjoining Defendants from the unfair, fraudulent and deceitful activity alleged

7  herein.

8                                          VIII.

9                              **THIRD CAUSE OF ACTION**

10                                **Breach of Contract**

11                               **(Against All Defendants)**

12      102.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

13      103.    Plaintiffs and Class Members entered into a written home loan agreement – the contract

14  or Note – with Defendants which describe terms and respective obligations applicable to the parties

15  herein.

16      104.    Defendants drafted the Notes and did not allow Plaintiffs or Class Members any

17  opportunity to make changes to the Notes and, due to Defendants' superior bargaining position, the

18  Notes were offered on a "take it or leave it" basis. As such, the Notes and the prepayment penalty riders

19  to the Notes are contracts of adhesion.

20      105.    Each Note and TILDS expressly and impliedly required Defendants to apply Plaintiffs'

21  and Class Members monthly payments to both principal and interest on a fully-amortized basis (i.e., so

22  that negative amortization would not occur) as long as those payments were in the amount reflected in

23  the Note and the TILDS. The Notes and the TILDS identified the monthly payments Plaintiffs and the

24  Class Members were required to make. Defendants were not permitted to impose or charge any

25  different payment amount. As alleged herein, the Notes expressly state and/or imply that those

26  payments would be applied to pay both principal and interest on the loan.

27      106.    Once Plaintiffs and Class Members entered into these loans, Defendants switched the

28  interest rate charged on the loans to a much higher rate than the one they promised to Plaintiffs and

                                    26
                  FIRST AMENDED CLASS ACTION COMPLAINT

1 Class Members as a "yearly rate." They also demanded payments in amounts that exceeded those

2 permitted by the Notes.

3      107.   As a result of Defendants' breach of the agreement, Plaintiffs and Class Members have

4 suffered harm. Plaintiffs and Class Members have incurred and will continue to incur additional interest

5 charges on the principal loan balance and surplus interest added to Plaintiffs' and Class Members'

6 principal loan balance. Furthermore, Defendants' breach has placed Plaintiffs and Class Members in

7 danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and Class

8 Members' principal loan balances to increase and limited these consumers' ability to make their future

9 house payments or obtain alternative home loan financing.

10      108.   At all times relevant, there existed a gross inequality of bargaining power between the

11 parties to the Loan Documents. At all times relevant, Defendants unreasonably and unconscionably

12 exploited their superior bargaining position and knowledge and foisted upon Plaintiffs and Class

13 Members extremely harsh, one-sided provisions in the contract, which Plaintiffs and Class Members

14 were not made aware of and could not reasonably have comprehended (e.g., Defendants' fraud and

15 failures to disclose as alleged herein), and which attempt to severely limit Defendants' obligations under

16 the contracts at the expense of Plaintiffs and Class Members, as alleged herein.

17      109.   WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief,

18 compensatory damages proximately caused by Defendants' breach of contract as alleged herein, pre-

19 judgment interest, costs of suit and other relief as the Court deems just and proper.

20

21 <div align="center">**IX.**</div>

22 <div align="center">**FOURTH CAUSE OF ACTION**</div>

23 <div align="center">**Tortuous Breach of Implied Covenant of Good Faith and Fair Dealing**</div>

24 <div align="center">**(Against All Defendants)**</div>

25      110.   Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

26      111.   As a direct and proximate result of the omissions and failures to disclose as alleged

27 herein, Plaintiffs and Class members reasonably expected that their payments for the first two to five

28 years of Defendants' loans would lower the balance due under the loans, thereby building up Plaintiffs'

1    and the Class Members' equity in their homes.

2         112.   At all times relevant during the liability period, Defendants consciously and deliberately

3    failed to apply Plaintiffs' and Class Members' payments in accordance with the reasonable expectations

4    of Plaintiffs and the Class Members and uniformly misapplied the payments therein, which unfairly

5    frustrated the agreed common purposes and disappointed the reasonable expectations of Plaintiffs and

6    Class Members.

7    ///

8         113.   Defendants uniformly and unfairly interfered with Plaintiffs' and Class Members' rights

9    to receive the principal benefit of the contract, *i.e.*, ownership of their homes. Defendants' loans have

10   stripped away a substantial portion of the equity Plaintiffs and Class Members had in their homes and, in

11   some cases, have actually resulted in the complete loss of their homes through foreclosure.

12        114.   Upon information and belief and at all times relevant, Defendants possessed full

13   knowledge and information concerning the above facts, including knowledge of the fact that negative

14   amortization increased the likelihood of default and thereby served to defeat the underlying purpose of

15   these loans which was to finance home ownership, and nevertheless sold these Option ARM loans

16   throughout the State of California, including Alameda County.

17        115.   Defendants' placing of their corporate and/or individual profits over the rights of others

18   is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on

19   the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the

20   advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified

21   said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or

22   conscious disregard for the rights and safety of others, including Plaintiffs and the general public.

23        116.   At all times relevant, Defendants' conduct, as alleged herein, was malicious, oppressive,

24   and/or fraudulent.

25        117.   As a result of Defendants' conduct, Plaintiffs and Class Members have suffered harm.

26   Plaintiffs and Class Members have incurred significantly increased debt that is secured by their homes.

27   Plaintiffs and Class members also have incurred and will continue to incur additional interest charges on

28   the principal loan balance and surplus interest that is added to their principal loan balances.

FIRST AMENDED CLASS ACTION COMPLAINT

1   Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and Class Members in

2   danger of losing their homes through foreclosure and limited these consumers' ability to obtain

3   alternative home loan financing.

4       118.    WHEREFORE, Plaintiffs and Class Members are entitled to declaratory relief, all

5   damages proximately caused by Defendants' breach of the implied covenant of good faith and fair

6   dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the

7   Court deems just and proper.

8

9                                           X.

10                              **PRAYER FOR RELIEF**

11      WHEREFORE, Plaintiffs and all Class Members pray for judgment against each Defendant,

12  jointly and severally, as follows:

13      A.      An order certifying this case as a class action and appointing Plaintiffs and their counsel

14              to represent the Class;

15      B.      For actual damages according to proof;

16      C.      For compensatory damages as permitted by law;

17      D.      For consequential damages as permitted by law;

18      E.      For punitive damages as permitted by law;

19      F.      For equitable relief, including restitution;

20      G.      For restitutionary disgorgement of all profits Defendant obtained as a result of their

21              unfair competition;

22      H.      For interest as permitted by law;

23      I.      For Declaratory Relief;

24      J.      For reasonable attorneys' fees and costs; and

25      K.      For such other relief as is just and proper.

26  ///

27  ///

28  ///

FIRST AMENDED CLASS ACTION COMPLAINT

1

2   DATED: June 18, 2009                SMOGER & ASSOCIATES

3                                       By:

4                                       Gerson H. Smoger, Esq.
                                        Steven M. Bronson, Esq.
5                                       Mark T. Baller, Esq.
                                        3175 Monterey Blvd
6                                       Oakland, CA, 94602-3560
                                        Tel: (510) 531-4529
7                                       Fax: (510) 531-4377

8                                       Jonathan Shub, Esq.
                                        Miriam L. Schimmel
9                                       SEEGER WEISS LLP
                                        1515 Market Street, Suite 1380
10                                      Philadelphia, PA 19107
                                        Phone: (215) 564-2300
11                                      Fax : (215) 851-8029

12                                      David M. Arbogast, Esq.
                                        Jeffrey K. Berns, Esq.
13                                      ARBOGAST & BERNS LLP
                                        19510 Ventura Boulevard, Suite 200
14                                      Tarzana, California 91356
                                        Phone: (818) 961-2000
15                                      Fax : (818) 654-5988

16                                      Attorneys for Plaintiffs and all others Similarly
                                        Situated

17

18                          **DEMAND FOR JURY TRIAL**

19      Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

20   DATED: June 18, 2009                SMOGER & ASSOCIATES

21                                       By:

22                                       Gerson H. Smoger, Esq.
                                         Steven M. Bronson, Esq.
23                                       Mark T. Baller, Esq.
                                         3175 Monterey Blvd
24                                       Oakland, CA, 94602-3560
                                         Tel: (510) 531-4529
25                                       Fax: (510) 531-4377

26                                       Jonathan Shub, Esq.
                                         Miriam L. Schimmel
27                                       SEEGER WEISS LLP
                                         1515 Market Street, Suite 1380
28                                       Philadelphia, PA 19107

30

**FIRST AMENDED CLASS ACTION COMPLAINT**



# EXHIBIT NO. 1

EXHIBIT 1

Prepared by: ANANT JERAITFOLCHN

LOAN #: 110755483

# ADJUSTABLE RATE NOTE
(MTA - Twelve Month Average Index : Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

AUGUST 20, 2005                    ORANGE                    CALIFORNIA
[Date]                             [City]                    [State]

1413 TORRENCE BLVD, TORRANCE, CA 90501-3303
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 416,000.00 _____ (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed _____ 115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is AMERICA'S WHOLESALE LENDER

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  2.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B) Interest Rate Change Dates

The interest rate I will pay may change on the first _____ day of OCTOBER, 2005 _____, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 375/1000 _____ percentage point(s)  3.375 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than  9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3. PAYMENTS**

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first _____ day of each month beginning on OCTOBER 01, 2005 _____. I will make these payments every month until I have paid all the Principal and interest and any

PayOption ARM Note - MTA Index
5N594-XX (03/04)(d)                    Page 1 of 4




UNITED TITLE COMPANY

Loan Administration   8/15/2007 9:00 AM  PAGE  3/005   805-520-5019

LOAN #: 118755453

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL

By: G.G.
UNITED TITLE COMPANY

LOAN #: 116755453

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.   NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     5.000   % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)   No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

* PayOption ARM Note - MTA Index
3098AXX (12/04)                                     Page 5 of 6

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL
BY: _G.G._
UNITED TITLE COMPANY

LOAN #: 110755483

**11.  SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

_Dorothy Quatta_ _____ -Borrower
DOROTHY  QUATTA

_____ -Borrower

_____ -Borrower

_____ -Borrower

© PayOption ARM Note - MTA Index
38344-XX (03/04)

Page 4 of 4

CERTIFIED TO BE A TRUE
AND CORRECT COPY OF ORIGINAL

BY  _G.G._
UNITED TITLE COMPANY

Loan Administration   8/15/2007 8:54 AM   PAGE   2/004   805-520-5019

Prepared by: ANANT JEBLETPOLCHAI

## TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: AMERICA'S WHOLESALE LENDER

☐ Preliminary   ☒ Final

DATE 09/19/2005

4500 Park Granada
Calabasas, CA 91302

BORROWER: DOROTHY PERALTA

LOAN 110753459
CASE NO.
Type of Loan CONV INSURED
NCARE WITH 1mo Intro
FO 3yr2PP

ADDRESS 1412 TORRANCE BLVD
CITY STATE / ZIP TORRANCE, CA 90501-2353
PROPERTY 1412 TORRANCE BLVD
TORRANCE, CA 90501-2353

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.632 % | $ 700,133.46 | $ 417,029.00 | $ 1,117,162.43 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 1,943.64 | MONTHLY BEGINNING 10/01/2005 |
| 12 | 2,663.25 | MONTHLY BEGINNING 10/01/2006 |
| 12 | 2,309.50 | MONTHLY BEGINNING 10/01/2007 |
| 12 | 2,346.91 | MONTHLY BEGINNING 10/01/2008 |
| 12 | 2,454.31 | MONTHLY BEGINNING 10/01/2009 |
| 36 | 3,236.14 | MONTHLY BEGINNING 10/01/2010 |
| 215 | 3,170.61 | MONTHLY BEGINNING 13/01/2011 |
| 1 | 3,167.46 | LAST PAYMENT DUE 09/01/2035 |

PAYMENT AMOUNT SHOWN ABOVE INCLUDES MONTHLY MORTGAGE INSURANCE PREMIUM.

DEMAND FEATURE ☒ This loan does not have a Demand Feature.   ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
1412 TORRANCE BLVD, TORRANCE, CA 90501-2353

ASSUMPTION: Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard Insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGE: If your payment is more than 15 days late, you will be charged a late charge of 5.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☒ may  ☐ will not  have to pay a penalty.
☒ may  ☐ will not  be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_Dorothy Peralta_   9/26/05
BORROWER/DATE

DOROTHY PERALTA

BORROWER/DATE

BORROWER/DATE

BORROWER/DATE

FINANCECORP
* Truth in Lending Disclosure
2C000-US (05/05)(d)

Page 1 of 2



04-29-2008   04:13pm   From-Countrywide Lancaster

PREPAYMENT PENALTY ADDENDUM

04-29-2008   04:14pm   From-Countrywide Lancaster                          681                    T-730   P.032/064   F-320

Prepared by: XXXXX COUNTRYWIDE

DATE:       04/24/2008
BORROWER: XXXXXX XXXXXXX
CASE #
LOAN #:      13XXXXXX
PROPERTY ADDRESS: XXXX XXXXXXX XXXX
                  XXXXXXX, CA XXXXX-XXXX

**ADJUSTABLE RATE MORTGAGE (ARM) LOAN PROGRAM DISCLOSURE**
**MONTHLY TREASURY AVERAGE INDEX (MTA) – PAYMENT CAPS**

American Wholesale Lender

This statement describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about other ARM programs will be provided upon request.

| | | |
|---|---|---|
| | | |




Page 1 of 3

32





LOAN #: 130755463

| | The examples below illustrate interest rate and payment charges based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January 2005 , and assume the maximum periodic increases in rates and payments. | |
|---|---|---|
| Initial Interest Rate | 1.000 % | 1.750 % |
| Maximum Interest Rate | 9.950 % | 9.950 % |
| First Year Payment | $32.16 | $36.72 |
| Maximum payment | $165.60   in the 3rd  year | $192.16   in the 3rd  year |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $60,000 MTA ARM below - Payment Cap loan with a discounted interest rate would be: $60,000/$10,000 = 6, 6 x $ 141.16    = $469.42                (12 months)

_____
Applicant                      Date
DOROTHY PROBASCO

_____
Applicant                      Date

_____
Applicant                      Date

_____
Applicant                      Date

33

2

# EXHIBIT NO. 2

**EXHIBIT 2**

ared by: ANIK NORTIKYAN

LOAN #: 99042769

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

S NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY
YMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR
CREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
RROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

APRIL 07, 2005                    HERMOSA BEACH                         CALIFORNIA

[Date]                              [City]                              [State]

1220 NORTH GRIFFITH PARK DRIVE, BURBANK, CA 91506-1144

[Property Address]

## BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 408,000.00      (this amount is called "Principal"),
s interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never
ceed       115   percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is
untrywide Bank, a Division of Treasury Bank, N.A.
ill make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to
cive payments under this Note is called the "Note Holder."

## INTEREST
### (A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly
: of     1.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of
; Note.

### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first              day of JUNE, 2005          , and on
t day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The
w rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the
nthly payment is recalculated in accordance with Section 3.

### (C) Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the
welve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity
one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates
.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most
cently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each
erest Rate Change Date is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The
te Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
)O & SEVEN-EIGHTHS          percentage point(s)   2.875 ("Margin") to the Current Index. The Note Holder will
n round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my
w interest rate until the next Interest Rate Change Date. My interest will never be greater than      9.950 %. Beginning with
: first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## PAYMENTS
### (A) Time and Place of Payments

LOAN #: 99042769

:r charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date will be applied to interest before Principal. If, on   MAY 01, 2035   , I still owe amounts under this Note, I will those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
). Box 10219, Van Nuys, CA 91410-0219
it a different place if required by the Note Holder.

**(B)   Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
, 312.29   , unless adjusted under Section 3(F).

**(C)   Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the first   day of NE, 2006   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My nthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The inimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last yment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the ount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in :tion 3(F) or 3(G) below.

**(D)   Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that uld be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity :e in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment ective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is led the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow yments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my w Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full yment for my monthly payment.

**(E)   Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the terest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest rtion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the fference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as ovided in Section 3(A).

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN   percent
115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit :e to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause e to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more' :quently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment ill be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal yments at the current interest rate.

**(G)   Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the ill Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as y Minimum Payment on the final Payment Change Date.

**(H)   Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are ·eater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

These Payment Options are only applicable if they are greater than the Minimum Payment.

### NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the ctive date of any change. The notice will include information required by law to be given to me and also the title and phone number of a person who will answer any question I may have regarding the notice.

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a :payment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a ment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my payments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no nges in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be set by an interest rate increase.

### LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other n charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge ll be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me t exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal we under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial :payment.

### BORROWER'S FAILURE TO PAY AS REQUIRED

#### (A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the :e it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000  % of my overdue yment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

#### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

#### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a rtain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the erest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered other means.

#### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, : Note Holder will still have the right to do so if I am in default at a later time.

#### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be id back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These penses include, for example, reasonable attorneys' fees.

### GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by :livering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note older a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be ven by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a fferent address if I am given a notice of that different address.

### OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this ote, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also

**. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the ecurity Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not ep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" :ans any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond r deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person d a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate yment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such ercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to :nder information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and ) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the an assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that )ligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will ntinue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The )tice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which orrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this :riod, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

---

STEVEN S. BIGVERDI                                          - Borrower

---

- Borrower

---

- Borrower

---

- Borrower

spared by: ANIK NORTIKYAN

**Countrywide Bank, a Division of Treasury Bank, N.A.**

ATE: 04/07/2005
ORROWER: STEVEN S. BIGVERDI
ASE #:
OAN #: 99042769
ROPERTY ADDRESS: 1220 NORTH GRIFFITH PARK DRIVE
BURBANK, CA 91506-1144

Branch #: 0000918
55 SOUTH LAKE AVENUE #150
PASADENA, CA 91101
Phone: (626) 431-2555
Br Fax No.: (626) 792-3411

## PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated  APRIL 07, 2005          , and is incorporated into and mends and supplements the Note of the same date (the "Note") given by me to ountrywide Bank, a Division of Treasury Bank, N.A. he "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security istrument") covering the property (the "Property") identified in the Security Instrument.

he section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first THIRTY SIX months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment.

Prepared by: AMIR NORTIKYAN

## TRUTH IN LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, a Division of Treasury Bank, N.A.

☐ Preliminary ☒ Final

DATE 04/27/2005

1199 North Fairfax St. Ste.500
Alexandria, VA 22310

BORROWERS: STEVEN S BIGVERDI

LOAN 39042769
CASE NO.
Type of Loan CONV UNINSURED
NCANN MTA 1mo Intro
PG 3yr39P

ADDRESS       1136 WINCHESTER AVE #156
CITY STATE / ZIP GLENDALE, CA 91201
PROPERTY      1220 NORTH GRIFFITH PARK DRIVE
              BURBANK, CA 91506-1144

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 5.321 % | $ 452,040.35 | $ 403,017.68 | $ 855,090.03 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 1,313.29 | MONTHLY BEGINNING 06/01/2005 |
| 12 | 1,410.71 | MONTHLY BEGINNING 06/01/2006 |
| 12 | 1,516.01 | MONTHLY BEGINNING 06/01/2007 |
| 12 | 1,630.25 | MONTHLY BEGINNING 06/01/2008 |
| 12 | 1,753.52 | MONTHLY BEGINNING 06/01/2009 |
| 299 | 2,348.38 | MONTHLY BEGINNING 06/01/2010 |
| 1 | 2,345.97 | LAST PAYMENT DUE 05/01/2035 |
| | | |
| | | |
| | | |

DEMAND FEATURE ☒ This loan does not have a Demand Feature. ☐ This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
1220 NORTH GRIFFITH PARK DRIVE, BURBANK, CA 91506-1144

ASSUMPTION: Someone buying this property ☐ cannot assume the remaining balance due under original mortgage terms.
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15     days late, you will be charged a late charge of     5.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
☒ may ☐ will not        have to pay a penalty.
☐ may ☒ will not        be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____   _____
BORROWER/DATE                      BORROWER/DATE
STEVEN S BIGVERDI

_____   _____
BORROWER/DATE                      BORROWER/DATE

FINANCODY
A Truth in Lending Disclosure
IC390-US (08/03)(d)        Page 1 of 2

spared by: ANIK NORTIKYAN

**Countrywioe Bank, a Division of Treasury Bank, N.A.**

ATE:      04/07/2005
ORROWER: STEVEN S. BIGVERDI
ASE #:
OAN #:    99042769
ROPERTY ADDRESS: 1220 NORTH GRIFFITH PARK DRIVE
                 BURBANK, CA 91506-1144

Branch #: 0000918
55 SOUTH LAKE AVENUE #150
PASADENA, CA 91101
Phone: (626) 431-2555
Br Fax No.: (626) 792-3411

### ADJUSTABLE RATE MORTGAGE (ARM) LOAN PROGRAM DISCLOSURE
### MONTHLY TREASURY AVERAGE INDEX (MTA) - PAYMENT CAPS

his disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our ther ARM programs will be provided upon request.

| HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED |
|---|

- Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin.

- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

- Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts.

- For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below.

| | MTA ARM (initial rate change at 1 month) | MTA ARM (initial rate change at 3 months) |
|---|---|---|
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br><br>• Your interest rate will never exceed the maximum set forth in your loan documents. The maximum rate will not be more than 9.95%. Please ask us for our current maximum rate. | |
| | How Your Payment Can Change | |
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate.<br><br>• At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date. | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amounts of the full payment and the limited payment. The full payment will be the amount sufficient to pay the unpaid balance in full by the maturity date at the interest rate in effect during the month preceding the payment change date. The limited payment will be your payment for the month preceding the payment change date increased by 7.5%. You will then have the choice each month of paying the lesser of the two, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. If you pay anything less than the Full Payment, which would not be sufficient to cover the interest due, the difference will be added to your loan amount. This means the balance of your loan could increase. This is known as "negative amortization". | |
| The unpaid principal of your loan: | • Can never exceed 115% (110% in New York) of the original amount borrowed, whether you limit your payment or pay the full payment. If that limit is reached, your monthly payment amount will be changed to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan. | |

LOAN #: 99042769

| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January, 2004 and assume the maximum periodic increases in rates and payments. | |
|---|---|---|
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | 1.25 % | 1.75 % |
| Maximum Interest Rate | 9.95 % | 9.95 % |
| First Year Payment | $33.33 | $35.72 |
| Maximum payment | $101.70       In the 6th year | $102.14       In the 6th year |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $60,000 MTA ARM Index - Payment Cap loan with a discounted interest rate would be: $60,000 / $10,000 = 6; 6 x $36.71 = $220.26 per month)

_____          _____
Applicant                            Date
STEVEN S. BIGVERDI

_____          _____
Applicant                            Date

_____          _____
Applicant                            Date

_____          _____
Applicant                            Date

3

# EXHIBIT NO. 3

EXHIBIT 3

Prepared by: CARLOS E. ESCOBAR

LOAN #: 113595977

# ADJUSTABLE RATE NOTE
### (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

| SEPTEMBER 12, 2005 | CASTRO VALLEY | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

30482 OAKMONT WAY, HAYWARD, CA 94544
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 199,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ___ 115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is Countrywide Bank, N.A.
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

**(A) Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B) Interest Rate Change Dates**

The interest rate I will pay may change on the **first** day of **NOVEMBER, 2005** , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3..

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO & SEVEN-EIGHTHS percentage point(s) 2.875 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than 9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the **first** day of each month beginning on. **NOVEMBER 01, 2005** . I will make these payments every month until I have paid all the Principal and interest and any




LOAN #: 113595977

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   OCTOBER 01, 2035   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$ 640.06   , unless adjusted under Section 3(F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the **first**   day of **NOVEMBER, 2006**   , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN   percent
(   115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments.

(iii)   15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.



LOAN #: 113595977

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.   NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000   % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

LOAN #: 113595977

**1L  SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

JAMES MOSCOSO                                                                                   - Borrower

_____
- Borrower

_____
- Borrower

_____
- Borrower

Prepared by: CARLOS E. ESCOBAR

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

LENDER: Countrywide Bank, N.A.

☐ Preliminary  ☒ Final

DATE 09/12/2005

1199 North Fairfax St. Ste.500
Alexandria, VA 22314

BORROWERS: JAMES MOSCOSO

LOAN        113595977
CASE NO.
Type of Loan CONV UNINSURED
NCARM MTA 1mo Intro
PO 3yrHPP

ADDRESS        30482 OAKMONT WAY
CITY STATE / ZIP HAYWARD, CA 94544
PROPERTY       30482 OAKMONT WAY
               HAYWARD, CA 94544

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 6.145 % | $ 262,321.66 | $ 191,810.90 | $ 454,132.56 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE |
|---|---|---|
| 12 | 640.06 | MONTHLY BEGINNING 11/01/2005 |
| 12 | 688.06 | MONTHLY BEGINNING 11/01/2006 |
| 12 | 739.66 | MONTHLY BEGINNING 11/01/2007 |
| 12 | 795.13 | MONTHLY BEGINNING 11/01/2008 |
| 12 | 854.76 | MONTHLY BEGINNING 11/01/2009 |
| 299 | 1,365.08 | MONTHLY BEGINNING 11/01/2010 |
| 1 | 1,361.60 | LAST PAYMENT DUE  10/01/2035 |
| | | |
| | | |
| | | |
| | | |

DEMAND FEATURE:  ☒   This loan does not have a Demand Feature.   ☐   This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
☒ This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at:
30482 OAKMONT WAY, HAYWARD, CA 94544

ASSUMPTION: Someone buying this property  ☐ cannot assume the remaining balance due under original mortgage terms.
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

PROPERTY INSURANCE: Hazard insurance, including flood insurance if the property is in a Special Flood Hazard Area, is required as a condition of this loan. You may obtain the insurance coverage from any insurance company acceptable to the lender. Complete details concerning insurance requirements will be provided prior to loan closing.

LATE CHARGES: If your payment is more than 15     days late, you will be charged a late charge of     5.000 % of the overdue payment

PREPAYMENT: If you pay off your loan early, you
☒ may   ☐ will not   have to pay a penalty.
☐ may   ☒ will not   be entitled to a refund of part of the finance charge.
See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____   BORROWER/DATE        _____   BORROWER/DATE
JAMES MOSCOSO                                   KAREN MOSCOSO

_____   BORROWER/DATE        _____   BORROWER/DATE

FHA/VA/CONV
■ Truth In Lending Disclosure
2C266-US (09/04)(d)                    Page 1 of 2





Prepared by: CARLOS E. ESCOBAR

Countrywide Bank, N.A.

DATE: 09/12/2005
BORROWER: JAMES MOSCOSO
CASE #:
LOAN #: 113595977
PROPERTY ADDRESS: 30482 OAKMONT WAY
HAYWARD, CA 94544

Branch #: 0000931
3201 DANVILLE BLVD, SUITE 177
ALAMO, CA 94507
Phone: (925)552-4740
Br Fax No.: (925)552-7004

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated SEPTEMBER 12, 2005 , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to
Countrywide Bank, N.A.
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "BORROWER'S RIGHT TO PREPAY" is replaced with the following new section:

## BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. Such an advance payment of Principal is known as a "Prepayment." I may make partial or full Prepayments. When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. **My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.**

● Prepayment Penalty Addendum
1E337-XX (12/04)(d)

Page 1 of 2







- Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin.

- The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

- Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts.

- For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below.

|  | 30-A ARM (annual rate changes at 1 month) | 5/1 A ARM (annual rate changes at 3 months) |
|---|---|---|
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br>• Your interest rate will never exceed the maximum set forth in your loan documents. The maximum rate will not be more than 9.95%. Please ask us for our current maximum rate. | |
| | **How Your Payment Can Change** | |
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate.<br>• At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date.I | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amounts of the full payment and the limited payment. The full payment will be the amount sufficient to pay the unpaid balance in full by the maturity date at the interest rate in effect during the month preceding the payment change date. The limited payment will be your payment for the month preceding the payment change date increased by 7.5%. You will then have the choice each month of paying the lesser of the two, and if the limited payment is less than the full payment, you can choose to pay more than the limited payment up to and including the full payment for your monthly payment. If you pay anything less than the Full Payment, which would not be sufficient to cover the interest due, the difference will be added to your loan amount. This means the balance of your loan could increase. This is known as "negative amortization". | |
| The unpaid principal of your loan: | • Can never exceed 115% (110% in New York) of the original amount borrowed, whether you limit your payment or pay the full payment. If that limit is reached, your monthly payment amount will be changed to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan. | |





*would be: $60,000 / $10,000 = 6; 6 x $ 101.58*          = $609.48          *per month)*

_____
Applicant                                      Date
JAMES MOSCOSO

_____
Applicant                                      Date

_____
Applicant                                      Date

_____
Applicant                                      Date